# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHERINE FLEMING, EDWARD R. HADUCK, and VICTORIA WENDEL | CASE NO.: |
| Plaintiffs, | **COMPLAINT** |
| v. | **CLASS ACTION (ERISA)** |
| FIDELITY MANAGEMENT TRUST COMPANY, FIDELITY INVESTMENTS INSTITUTIONAL OPERATIONS COMPANY, INC., | |
| Defendants. | |

## PRELIMINARY STATEMENT

1.      Plaintiffs Katherine Fleming, Edward Haduck, and Victoria Wendel bring this action on behalf of the Delta Family-Care Savings Plan ("Delta Plan") and all other similarly situated qualified retirement plans ("Plans"), under Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3) against Fidelity Management Trust Company ("FMTC") and Fidelity Investments Institutional Operations Company, Inc. ("FIIOC," collectively with FMTC, "Fidelity" or "Defendants").

2.      Defendants provide services to qualified retirement plans subject to the provisions of ERISA and directly or indirectly to the Plans in connection with the matters alleged in this Complaint.

3.      More specifically, Defendants provide a platform for the administration of "individual account plans," which are tax-qualified retirement plans maintained by employers for the benefit of their employees.  An individual account plan is defined in Section 3(34) of ERISA, 29 U.S.C. § 1002(34),  as "a pension plan which provides for an individual account for each participant and for benefits based solely on the amount contributed to the participant's account, and any income, expenses, gains and losses . . . which may be allocated to such participant's account."

4.      Many of the plans for which Defendants provide recordkeeping and other administrative services are "401(k) plans," which permit individual Plan participants to contribute a portion of their salary and wages on a pre-tax basis in order to save for retirement. In many cases, the employer-sponsors make matching contributions and/or profit-sharing contributions to supplement the employees' contributions.  Nearly all Plans designate a number

of mutual funds or other collective investment funds as the Plans' "designated investment alternatives" and give individual Plan participants the ability to choose how their Plan accounts will be invested by allocating their accounts among the designated investment alternatives.  In fact, most of the Plans that offer investment choices, including the Delta Plan, actually purport to transfer the entire responsibility and liability for investment decisions to the participants.[1]  The Delta Plan warns participants that "the fiduciaries of the Plan may be relieved of liability for any losses that are the direct and necessary result of investment instructions given by a participant. This means that Plan fiduciaries will not be liable for investment losses or any breach of fiduciary duty resulting from a participant's exercise of control over his or her account."[2]

5.     The large body of federal securities law confirms that the average American worker is not sophisticated about investment matters. As recognized by the Employee Benefit Security Administration ("EBSA") of the U.S. Department of Labor ("DOL"), "[g]iven the rise in participation in 401(k) type plans and IRAs, the retirement security of millions of America's workers increasingly depends on their investment decisions. ***Thus, there is increased recognition of the importance of investment advice in helping participants avoid costly investment errors***."[3] (Emphasis added.)

6.     In connection with this need, Fidelity contracted with Financial Engines Advisors L.L.C. ("FE"), a federally registered investment advisor and wholly-owned subsidiary of

---

[1] *See* ERISA section 404(c), 29 USC § 1104(c) and the regulations thereunder.
[2] Delta Family-Care Savings Plan Summary Plan Description at 23.
[3] EBSA Fact Sheet, "*Proposed Regulation to Increase Workers' Access to High Quality Investment Advice,*" Fe. 26, 2010, available at http://www.dol.gov/ebsa/newsroom/fsinvestmentadvice.html (last reviewed March 24, 2016) (emphasis added).

Financial Engines, Inc., to provide investment advice services to individual participants in the

Plans that are administered by Fidelity. FE acknowledges that it is an ERISA fiduciary with

respect to the investment advice program and charges a fee for its services as a percentage of the

value of a participant's account.

7.      Fidelity was not content, however, with providing participants access to FE's

services. Fidelity wanted a piece of FE's action, as well. Accordingly, in order to be included as

the investment advice service provider on Fidelity's platform, FE agreed to pay – and is paying –

Fidelity a significant percentage of the fees it collects from 401(k) plan investors, like Plaintiffs

Haduck and Wendel. These fees are not being paid for any substantial services being provided

by Fidelity to FE or to participants of the Plans, but are instead being paid as part of a so-called

"pay-to-play" arrangement; better described in the pejorative as a kick-back. This "pay to play"

arrangement wrongfully inflates the price of investment advice services that are critical to the

successful management of workers' retirement savings and violates the fiduciary responsibility

and prohibited transaction rules of Sections 404 and 406 of ERISA, 29 USC §§ 1104 and 1106.

8.      Fidelity offers another service to the Plans that allows Plan participants to invest

in a wide range of mutual funds that are not included among the Plans' designated investment

alternatives, through an account that is alternatively referred to as a "brokerage window" or

"self-directed brokerage account." The brand name for Fidelity's self-directed brokerage

accounts is "BrokerageLink." BrokerageLink is available to participants in the Delta Plan and

the proposed class of similarly-situated Plans.

9.      Securities available to be purchased through BrokerageLink include, among other

types of investments, stocks, bonds, exchange-traded funds, Fidelity mutual funds, and non-

Fidelity mutual funds available through Fidelity Funds Network.

10.     A retirement plan investor who wishes to invest, for example, in a mutual fund that is not available from the menu of the Plan's designated investment alternatives can invest in that mutual fund through BrokerageLink.  There is no dispute that in such a case, it is the class member/retirement plan participant who is making an initial investment decision.

11.     Selecting a particular mutual fund is not, however, the only discretionary decision made in the process of completing a purchase of a mutual fund.  Many mutual funds offer different share classes that have different charges and fees, depending largely on the identity of the investor and the size of the investment.  Typically, a mutual fund that offers different share classes will offer "retail" or "investor" shares as well as "institutional" shares.

12.     The retail or investor share classes are designed to be offered to individual investors who have smaller amounts to invest and with respect to which the mutual fund must maintain individual investor records.  Retail shares have higher expenses.  Indeed, retail class funds will often make "revenue sharing payments" to other parties for distributing the shares to retail customers or ostensibly for recordkeeping, sub-transfer agent fees and other shareholder services.

13.     Institutional class shares, as the name implies, are sold to institutional investors like qualified retirement plans that have large amounts to invest and do not purchase through a broker or other distributor.  The purchases and redemptions of mutual fund shares by thousands of individual participants in these retirement plans are aggregated by Fidelity and other individual account plan platform providers through an omnibus account.  As a result, from the perspective of the mutual fund, the recordkeeper for these plans is the sole investor in the mutual fund.  Generally speaking, fund managers for institutional class shares do not make any revenue sharing payments, or they make lower revenue sharing payments than for retail shares.

14.     Qualified retirement plans, almost regardless of the size of the plan, are customarily eligible to purchase institutional class shares where available.[4]

15.     Fidelity is responsible for effecting all trades made through BrokerageLink, including the discretionary decision regarding which share class to acquire for the participant. Share class selection for the investment of the Plans' assets is a discretionary decision by Fidelity with respect to the investment of the assets of ERISA-governed plans. As such, Fidelity is a fiduciary with respect to that decision and, therefore, a fiduciary with respect to the Plans.[5]

16.     On information and belief, notwithstanding the obvious advantage of investing in institutional share classes available to a qualified retirement plan, when participants in the Plans invest through BrokerageLink and the mutual funds selected by the participants offer more than one share class, Fidelity does not always acquire the class of shares with the lowest expense ratio.

17.     Instead, Fidelity acquires share classes that have higher expense ratios and that will pay Fidelity significant amounts in revenue sharing payments, effectively using the Plans' assets for its own benefit and for its own account. In doing so, Fidelity exercised its discretionary authority over retirement plan assets in a manner designed to increase its compensation at the expense of participants. Such conduct violates both (i) Fidelity's basic fiduciary obligation to exercise its discretionary authority over the selection of share classes

---

[4] *See, e.g., FINRA Fines Merrill Lynch $8 Million; Over $89 Million Repaid to Retirement Accounts and Charities Overcharged for Mutual Funds*, available at https://www.finra.org/newsroom/2014/finra-fines-merrill-lynch-8-million-over-89-million-repaid-retirement-accounts-and (last reviewed May 18, 2016).

[5] Section 3(21)(A) of ERISA, 29 USC §1003(21)(A), provides that a person is a fiduciary with respect to a plan to the extent he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets.

solely in the best interests of the proposed class of Plans and their participants and (ii) the

express ERISA prohibition against a fiduciary using plan assets in its own interest or for its own

account.

18.     Perhaps in awareness of the impropriety of these practices, Fidelity took

affirmative steps to conceal from Plan participants these practices and the compensation they

generated for Fidelity by providing incomplete, inaccurate, misleading or false information

required to be included in the Annual Returns on Form 5500 for the Delta Plan and other Plans

with respect to the revenue sharing issues in this case.  For example, for the Delta Plan Annual

Return for the 2012 plan year, Fidelity provided information with respect to its receipt of revenue

sharing payments from approximately 170 mutual fund companies in connection with

BrokerageLink, naming each mutual fund and the amount of revenue sharing as a percentage of

investment.  In contrast, for the 2013 and 2014 plan years, Fidelity appears to have provided no

detailed information about revenue sharing payments other than to report that it received indirect

compensation from BrokerageLink with no other details.

## JURISDICTION

19.     Plaintiffs bring this action pursuant to ERISA §§ 502(a)(2) and 502(a)(3), 29

U.S.C. §§ 1132(a)(2), and (3).  This Court has subject matter jurisdiction over Plaintiffs' claims

pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and pursuant to 28 U.S.C. § 1331

because this action arises under the laws of the United States.  This Court also has jurisdiction

over the subject matter of this action pursuant to 18 U.S.C. §§ 1961, 1962 and 1964; 28 U.S.C.

§§ 1331, 1332 and 1367; and 15 U.S.C. § 15.

20.     Pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. §§ 1391(b) and (c), venue is

proper in this District because Defendant Fidelity has a principal place of business in this District

from which Defendants' recordkeeping services are performed. In addition, the violations alleged herein occurred in this District.

## THE PARTIES AND THE PLANS

21.    At all relevant times (the "Relevant Period"), Plaintiffs Fleming, Haduck, and Wendel have been participants in the Delta Plan, an ERISA Plan as defined in ERISA § 3(7), 29 U.S.C. § 1002(7).  Plaintiffs Haduck and Wendel engaged FE to provide investment advice. Plaintiff Fleming invested through BrokerageLink.

22.    Plaintiff Katherine Fleming is a resident of Roseville, CA. She participated in the Delta Plan during the Relevant Period. A significant portion of her account was invested through BrokerageLink during the Relevant Period.

23.    Plaintiff Edward Haduck is a resident of Pontiac, MI. He participated in the Delta Plan during the Relevant Period, during which his account was invested through FE's Personal Asset Manager.

24.    Plaintiff Wendel is a resident of Atlanta, GA. She participated in the Delta Plan during the Relevant Period, during which her account was invested through FE's Personal Asset Manager.

25.    At all relevant times, the Delta Plan was an employee pension benefit plan within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) and an individual account plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

26.    Defendant Fidelity Investments Institutional Operations Company, Inc. is an affiliate and wholly-owned subsidiary of Defendant Fidelity Management Trust Company, a Massachusetts corporation with its headquarters in Boston, Massachusetts.  FIIOC provides trust services, recordkeeping and information management services for employee benefit plans for

which it received direct compensation from the Delta Plan and other Plans, and received indirect compensation from other service providers to the Plans in connection the services FIIOC provides to FMTC and to the Plans.  FIIOC serves as an agent to FMTC and is located in Boston, Massachusetts.

27.     FMTC serves as the trustee of the Delta Plan.  FMTC holds the Delta Plan's investment assets and executes investment transactions.  The Delta Plan allows participants to self-direct their contributions and account balances in a Fidelity BrokerageLink Account.  These self-directed accounts provide for the participant to place trading orders with FMTC pursuant to a limited power of attorney.

28.     At all relevant times,  Fidelity provided recordkeeping and other administrative services to the Plans, which services included availability of investment advisory services provided by FE and self-directed brokerage accounts available through BrokerageLink.

29.     At all relevant times, FE was the exclusive provider of individualized investment advice services to participants in the Plans.

## NATURE OF THE ACTION – ERISA CLAIMS

**Fidelity's Fee Sharing Arrangement with Financial Engines**

30.     Fiduciaries for retirement plans owe the plan and its participants and beneficiaries duties described as among the "highest known to the law." *Braden v. Walmart Stores, Inc.*, 588 F.3d 585, 602 (8th Cir. 2009).

31.     When choosing service providers for a retirement plan, and especially when choosing a service provider who will be a fiduciary to the retirement plan, an ERISA plan fiduciary is required to act with the care, skill, prudence and diligence that would be exercised by someone who is experienced and knowledgeable about the services to be provided; a prudent

expert.  Most fundamentally, ERISA fiduciaries are required to act solely in the best interests of plan participants.  ERISA § 404(a)(1), 29 U.S.C. 1104(a)(1).

32.     Specifically with respect to that most fundamental fiduciary obligation, ERISA prohibits a plan fiduciary from: (i) dealing with the assets of the plan for its own benefit or for its own account; (ii) representing a party or acting in a transaction on behalf of a party whose interests are adverse to the interests of the plan or its participants; and (iii) receiving for its own account any consideration from a party dealing with such plan in a transaction involving plan assets.  ERISA § 406(b), 29 U.S.C. § 1106(b).

33.     "Hiring a service provider in and of itself is a fiduciary function."[6]   Fidelity hired FE and controlled the negotiation of the terms and conditions under which FE would provide its services to Plaintiffs Plan participants —specifically, the terms requiring payment to Fidelity of a portion of the fees paid by retirement plan investors for participating in the investment advice program.  While the Plans' sponsors selected Fidelity as the Plans' recordkeeper, if a Plan sponsor wanted to include an investment advice program in the suite of services, there was no choice but to accept FE as the provider together with the unlawful fee-sharing arrangement complained of herein.

34.     Because it was Fidelity that selected FE as the provider of investment advice to the Plans, and the selection of a plan service provider is a fiduciary function, Fidelity is a fiduciary to the Plans.  The inclusion of an investment advice provider such as FE for Plans contracting with Fidelity for recordkeeping and other administrative services is treated no differently under ERISA than selection of plan investment choices that are required to be

---

[6] EBSA Publication *Meeting Your Fiduciary Responsibilities*, available at http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html (last visited Mar. 24, 2016).

included in a plan's lineup of investment choices.[7]

35.     In turn, because Fidelity's agreement with FE mandated the payment of a fee to Fidelity based on the use by participants in the Plans of the investment advice program, Fidelity caused the Plans to engage in transactions resulting in the transfer of plan assets to or for the benefit of parties-in-interest.  This occurred through the imposition of excessive fees necessary to support Fidelity's unlawful fee sharing arrangement with FE.

36.     The fee charged by FE is specified in the Summary Plan Description for the Delta Plan as a percentage of the value of a participant's account invested through FE:  45 basis points (forty-five hundredths of one percent) for the first $100,000 invested; 35 basis points for the next $150,000 invested; and 20 basis points for amounts in excess of $250,000 invested.  Forty-five basis points is the maximum FE fee for any individual participant's account.  For accounts with balances in excess of $100,000, the FE fee is, therefore, less than 45 basis points.

37.     FE's Form ADV filed with the Securities and Exchange Commission in connection with FE's status as a registered investment adviser states:  "FEA may reimburse or compensate certain plan providers for maintaining secure communications links between the plan provider's information systems and FEA's systems for the purpose of facilitating the provision of FEA's services to FEA's clients who are plan participants."

---

[7] "Viewing the evidence in the light most favorable to the Trustees, a reasonable jury could conclude that Nationwide exercises authority or control respecting disposition of plan assets by controlling which mutual funds are available investment options for the Plans and participants.

*          *          *

Accordingly, Nationwide may be a fiduciary to the extent that it exercises authority or control over plan assets by determining and altering which mutual funds are available for the Plans' and participants' investments."  *Haddock v. Nationwide Financial Services, Inc.,* 419 F. Supp. 2d 156, 166 (D. Conn. 2006).

38.    On information and belief, FE is paying Fidelity 22.5 basis points with respect to Delta Plan accounts invested through FE.  This percentage is exactly half of the **maximum** fee charged by FE. In other words, Fidelity is getting the same fee for "maintaining secure communications links" as FE is receiving for providing professional investment advice to participants.  Since FE's fee is less than 45 basis points for the portion of a participant's account that exceeds $100,000, for accounts that exceed $100,000, Fidelity's fee is actually **greater** than the fee paid for the investment advice.  On a relative value basis, Fidelity's fee for whatever service, if any, it actually provides with respect to participants' use of FE's service is plainly unreasonable.

39.    On information and belief, Fidelity is also receiving a fee from FE based on the number of participants eligible to participate in FE's online advice program.

40.    The Annual Returns for the Delta Plan, filed with the EBSA on Form 5500, for plan years from 2009 through 2014, report that FE was a service provider to the Delta Plan and received direct compensation from the Delta Plan, but there is no disclosure of Fidelity's receipt of indirect compensation from FE.[8]

41.    There is no disclosure of Fidelity's receipt of indirect compensation from FE in the participant fee disclosure required to be provided to all participants by 29 CFR 2550.404a-5(c) which, on information and belief, was prepared by Fidelity.

---

[8] The Delta Plan Form 5500s indicate that FIIOC reported receiving only "eligible indirect compensation," defined in the Instructions for Form 5500 as "[i]ndirect compensation that is fees or expense reimbursement payments charged to investment funds and reflected in the value of the investment or return on investment of the participating plan or its participants[,] finders' fees[,] 'soft dollar' revenue, float revenue, and/or brokerage commissions or other transaction-based fees for transactions or services involving the plan that were not paid directly by the plan or plan sponsor.".  However, the revenue sharing payments received by Fidelity that are the subject of this litigation are not considered "eligible indirect compensation" for purposes of Form 5500 reporting.

42.     There is no disclosure of Fidelity's receipt of indirect compensation from FE in the Delta Plan's Summary Plan Description.

43.     There is no rational justification for an asset-based fee for whatever services Fidelity provided in connection with FE's investment advice program.  For example, the level of Fidelity's services to a participant who chooses to use FE's investment advice service does not increase when that participant's account has grown through additional contributions or investment gains, yet Fidelity's fee will increase in proportion to the increase in the value of the account.

44.     Likewise, Fidelity provides no greater service to one Plan participant whose account value invested through FE is $50,000 than to another Plan participant whose account value invested through FE is $75,000, yet Fidelity's fee for the latter participant's account is 50% greater than the fee for the former's account.

45.     In fact, since the interface of FE's advice program with Fidelity's recordkeeping system does nothing more than implement investment instructions on behalf of participants in the same manner that participants directly provide investment instructions in the Plans, rights that all participants have simply by virtue of their participation in the Plans, Fidelity is doing nothing more than providing an electronic mechanism for implementing instructions the participants could implement on their own.

46.     The cost of maintaining "secure communications links" between Fidelity and FE does not increase appreciably when the number of participants in a Plan using FE's services increases from 2000 to 3000, but Fidelity's fee for providing the service could increase by 50%. An asset-based fee for a fixed level of service is unreasonable.

47.     Whether or not an asset-based fee for a fixed service is ever reasonable, the

amount of compensation Fidelity received was plainly unreasonable in relation to the service being provided.

48.     As a result of this fee sharing arrangement with FE, Fidelity received for its own account consideration from a party (FE) dealing with the Plans in transactions involving plan assets, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

49.     Even if, *arguendo*, Fidelity was not considered a fiduciary with respect to the selection of FE and the imposition of the fee-sharing arrangement on the Plans, the U.S. Supreme Court has made it clear that ERISA § 502(a)(3) authorizes a civil action against a non-fiduciary who participates in a transaction prohibited by ERISA § 406:[9]

> As petitioners and *amicus curiae* the United States observe, it has long been settled that when a trustee in breach of his fiduciary duty to the beneficiaries transfers trust property to a third person, the third person takes the property subject to the trust, unless he has purchased the property for value and without notice of the fiduciary's breach of duty. The trustee or beneficiaries may then maintain an action for restitution of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom.[10]

**Fidelity's Receipt of Revenue Sharing Payments from Participant Investment Through BrokerageLink**

50.     The assets of the Delta Plan are held in and invested through the Delta Air Lines Inc. Defined Contribution Plans Master Trust (the "Master Trust"). The Annual Return for the Delta Plan for 2014 reports that the value of the Delta Plan's interest in the Master Trust was $7,567,007,849.  Of that total, $2,831,260,369, or 37.5% of total plan assets, is invested through BrokerageLink.

51.     The 2009 Return reports 178 mutual funds acquired through BrokerageLink that made revenue sharing payments to Fidelity in amounts that varied between 5 and 55 basis points.

---

[9] *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000).
[10] *Id.*, at 245.

As indicated in Table 1 below, the revenue sharing payment made to Fidelity was 35 basis points or more for 124 or approximately 70% of those funds, and 5-25 basis points for 54 of those funds:

| TABLE 1<br><br>DISTRIBUTION OF REVENUE SHARING FEE AMOUNTS | | |
|---|---|---|
| **Revenue Sharing Fee** | **Number of Funds** | **Percentage of Total Number of Funds** |
| 5 basis points | 3 | 1.69% |
| 10 basis points | 14 | 7.87% |
| 15 basis points | 14 | 7.87% |
| 20 basis points | 1 | 0.56% |
| 25 basis points | 22 | 12.36% |
| 30 basis points | 0 | 0.00% |
| 35 basis points | 86 | 48.31% |
| 40 basis points | 25 | 14.04% |
| 45 basis points | 4 | 2.25% |
| 50 basis points | 5 | 2.81% |
| 55 basis points | 4 | 2.25% |

52.     The 2010 Return, filed on October 17, 2011, reports that more than 164 mutual funds acquired through BrokerageLink made revenue sharing payments to Fidelity, with a similar distribution of the amount of the fees as reported for 2009.  The Auditor's Report attached to the 2010 Return reports that $830 million was invested in either external mutual funds or Fidelity mutual funds.  If, for example, 48% of the dollar value of BrokerageLink

investments by Delta Plan participants was invested in funds paying 35 basis points in revenue sharing (and, according to the 2010 Return, 48% of the mutual funds that were paying revenue sharing to FIIOC were paying 35 basis points), Fidelity would have received nearly $1.4 million in fees in a single year that should otherwise have enhanced Delta Plan participants' investment returns.  Instead, participants have paid – and are paying – Fidelity enormous fees simply for obtaining access to mutual funds that are already established on Fidelity's platform.

53.     The 2013 Return reflects an entirely different approach to reporting indirect compensation received by Fidelity from all funds acquired through BrokerageLink.  The 2013 Return erroneously reported that FIIOC received eligible indirect compensation, but it no longer listed the funds making revenue sharing payments.  The 2013 Return disclosed only that FIIOC is receiving an unspecified amount of indirect compensation from BrokerageLink.  There is no discernible purpose or justification for Fidelity changing the information it provided to the Plans for reporting on Form 5500 by failing to report information reported in previous years, other than a deliberate attempt to conceal the amount of Fidelity's compensation.

54.     To be sure, not every mutual fund Fidelity offers through BrokerageLink that makes revenue sharing payments has more than one share class.  Nonetheless, the revenue sharing payments result in Fidelity's receipt of excessive compensation for the service provided in violation of ERISA § 408(b)(2), 29 USC § 1108(b)(2).  The weighted average of revenue sharing payments reported on the Annual Return for the Delta Plan in 2012 is 31.4335 basis points.  If that rate of revenue sharing applied to the $830 million invested in mutual funds through BrokerageLink, the Delta Plan alone would be paying $2.6 million annually to provide participants with nothing more than access to those mutual funds.

## CLASS ACTION ALLEGATIONS

55.      29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

56.      In acting in this representative capacity, and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §§1132(a)(2) and (3), Plaintiffs seek to certify this matter as a class action on behalf of all participants and beneficiaries of the Delta Plan and Plans.  Plaintiffs seek to certify, and to be appointed as representative of, the following classes:

> **The FE Class:**
>
> The Delta Plan and every other participant-directed individual account plan for which Fidelity provides recordkeeping services and for which FE provides investment advice to Plan participants, one or more of whom have elected to utilize FE's services, at any time from May 20, 2010 through the date of judgment.
>
> **The BrokerageLink Class**
>
> The Delta Plan and every other participant-directed individual account plan for which Fidelity provides recordkeeping services and of which one or more participants has invested in mutual funds through BrokerageLink, at any time from May 20, 2010 through the date of judgment.

57.      This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.      The proposed Classes include hundreds if not thousands of members and is so large that joinder of all its members is impracticable.

b.      There are questions of law and fact common to the Classes because the Defendants owed fiduciary duties to the Delta Plan and to all Plans and took the actions and omissions alleged herein as to all of the Plan and not as to any individual Plan. Thus, common questions of law and fact include the following, without limitation: whether Fidelity is a fiduciary with respect to the Plans and is liable for the remedies provided by 29 U.S.C. §1109(a); whether as a fiduciary of the Plans, Fidelity breached its fiduciary duties to the Plans; how the losses to the Plans resulting from each breach of fiduciary duty are to be calculated; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.      Plaintiffs' claims are typical of the claims of the Classes because each Plaintiff was a Delta Plan participant during the time period at issue in this action, utilized FE's or BrokerageLink services, and all similarly situated participants in the Plans were harmed by Defendants' misconduct.

d.      Plaintiffs are adequate representatives of the Class because they were participants in the Delta Plan during the Class period utilizing the services of BrokerageLink and/or FE, have no interest that is in conflict with the Classes, are committed to the vigorous representation of the Classes, and have engaged experienced and competent attorneys to represent the Class.

e.      Prosecution of separate actions by individual Plans for these breaches of fiduciary duties would create the risk of: (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their

fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a), and (2) adjudications by the Delta Plan regarding these breaches of fiduciary duties and remedies for the Delta Plan would, as a practical matter, be dispositive of the interests of the Plans not parties to the adjudication or would substantially impair or impede those Plans' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

58.     A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual Plans may be small and impracticable for individual Plans to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

59.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

### COUNT I
### Breach of Duty of Loyalty – Investment Advice Program
### Dealing with Plan Assets for its Own Account

60.     Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

61.     ERISA § 404, 29 U.S.C. §1104, requires Fidelity to perform its fiduciary duties and responsibilities in the best interest of Plan participants for the purpose of providing them

benefits under the Plans.

62.     ERISA § 406(b)(1), 29 U.S.C. §1106(b)(1), prohibits a fiduciary from dealing

with the assets of a plan in its own interest or for its own account.

63.     ERISA § 406(b)(3), 29 U.S.C. §1106(b)(1), prohibits a fiduciary from receiving

any consideration for its own personal account from any party dealing with such plan in

connection with a transaction involving the assets of the plan.

64.     Fidelity acted as a fiduciary to Plaintiffs, the Delta Plan, and the Plans by, *inter*

*alia*: (a) hiring FE and controlling the negotiation of the terms and conditions under which FE

would provide its services to Plan participants; and (b) selecting FE as an investment advice

provider for Plan participants.

65.     Fidelity breached its duty of loyalty under ERISA owed to Plaintiffs, the Delta

Plan, and the Plans.  These breaches include, *inter alia*: (a) receiving revenue sharing payments

from FE for Fidelity's own benefit, at the expense of plan participants and the Plans; and (b)

charging unreasonable and excessive fees for the services provided to FE in connection with

FE's investment advice program.

66.     Fidelity is liable under 29 U.S.C. §1109(a) to make good to the Plans any losses

to the Plans resulting from the breaches of fiduciary duty alleged in this Count and is subject to

other equitable or remedial relief as appropriate.

## COUNT II
### Non-Fiduciary Liability for Fiduciary Breach – Receipt of Improper Payment from Investment Advisor

67.     Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs

as if fully set forth herein.

68.     FE, as a fiduciary to the Plaintiffs, the Delta Plan and the Plans, charged

unreasonably excessive fees for the purpose of transferring plan assets to or for the benefit of Fidelity as a party-in-interest to the Plans.

69.     The authority provided in ERISA Section 502(a)(3) to a plan participant, beneficiary, or fiduciary to bring a civil action for appropriate equitable relief extends to a suit against a non-fiduciary "party in interest" to a prohibited transaction barred by section 406.[11]

70.     Defendant Fidelity knew or should have known that its fee-sharing arrangement with FE violated sections 406(a) and 406(b) of ERISA and, as the recipient of the improper payment, is liable to Plaintiffs and the Plans for disgorgement of the proceeds of the illegal arrangement.

71.     Fidelity is liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duty alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT III

### Breach of Duties of Loyalty – Share Class Selection in BrokerageLink
### Dealing with Plan Assets for its Own Account

72.     Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

73.      ERISA § 404, 29 U.S.C. §1104, requires Fidelity to perform its fiduciary duties and responsibilities duties solely in the best interest of Plan participants for the purpose of providing to them benefits under the Plans.

74.     ERISA § 406(b)(1), 29 U.S.C. §1106(b)(1), prohibits a fiduciary from dealing with the assets of a plan in its own interest or for its own account.

75.     ERISA § 406(b)(3), 29 U.S.C. §1106(b)(1), prohibits a fiduciary from receiving

---

[11] *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000).

any consideration for its own personal account from any party dealing with such plan in

connection with a transaction involving the assets of the plan.

76.     Fidelity had the discretionary authority to select the share classes of mutual funds

to purchase for Plaintiffs and the Plans through BrokerageLink.

77.     Fidelity exercised that discretion in its own interest and for its own account at the

expense of participants in the Plans by selecting share classes that charged higher fees than share

classes otherwise available for investment to Plaintiffs and the Plans.

78.     Fidelity did so for the purpose of receiving significant amounts of revenue sharing

payments from the managers of those mutual funds that greatly exceeded reasonable

compensation for the service being provided.

79.     Defendants are liable under 29 U.S.C. §1109(a) to make good to the Plans any

losses to the Plans resulting from the breaches of fiduciary duty alleged in this Count and is

subject to other equitable or remedial relief as appropriate.

## COUNT IV

**Prohibited Transaction - Excessive and Unreasonable Compensation for
BrokerageLink Services and Services Related to Financial Engines in Violation of
ERISA §408(b)(2)**

80.     Plaintiffs repeat and reallege the allegations contained above as if fully stated

herein.

81.     Section 406(a)(1)(C) of ERISA, 29 USC § 1106(a)(1)(C), generally prohibits the

direct or indirect furnishing of services between a plan and a party-in-interest.

82.     Section 3(14) of ERISA, 29 U.S. Code § 1002(14) defines a party-in-interest as,

among other things, as a person providing services to a plan.

83.     As a result of providing trust and recordkeeping service to the Delta Plan and the

Plans, Fidelity is a party-in-interest to the Plans.

84.     Section 408(b)(2) of ERISA, 29 USC § 1108(b)(2)  exempts from the prohibitions

of ERISA § 406(a)(1)(C) "contracting or making reasonable arrangements with a party in

interest for office space, or legal, accounting, or other services necessary for the establishment or

operation of the plan, *if no more than reasonable compensation is paid therefor*" (emphasis

added).

85.     The indirect compensation Fidelity received from (i) the mutual funds acquired

through BrokerageLink and (ii) from FE in connection with FE's services to the Plans and their

participants constitutes excessive and unreasonable compensation for which no exemption is

available.

86.     Accordingly, Defendants are liable to Plaintiffs and the Plans for their actual

damages as proven at trial plus interest and attorneys' fees.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

A.     Certify this action as a class action as stated here and appoint Plaintiffs' counsel

as Class Counsel pursuant to Federal Rule of Civil Procedure 23;

B.     Declare that Defendants breached their fiduciary duties to the Classes;

C.     Enjoin Defendants from further violations of its fiduciary responsibilities,

obligations, and duties and from further engaging in transactions prohibited by ERISA;

D.     Order that Defendants make good to the Plans the losses resulting from their

serial breaches of fiduciary duty;

E.      Order that Defendants disgorge any profits that they have made through their breaches of fiduciary duty and prohibited transactions and impose a constructive trust and/or equitable lien on any funds received by Defendants therefrom;

F.      Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the Plans;

G.      Order Defendants to pay prejudgment interest; and

H.      Award such other and further relief as the Court deems equitable and just.


DATED this 20th day of May, 2016.

By:     /s/ Paul T. Sullivan
        Paul T. Sullivan (BBO # 659413)
        Jeffrey Gordon (BBO # 685981)
        ZELLE LLP
        600 Worcester Road, Suite 101
        Framingham, Massachusetts 07102
        Telephone:  (781) 466-0700
        Facsimile:  (781) 466-0701
        psullivan@zelle.com
        jgordon@zelle.com

        Christopher Micheletti*
        Heather T. Rankie*
        ZELLE LLP
        44 Montgomery Street, Suite 3400
        San Francisco, California 94104
        Telephone: (415) 633-1912
        Facsimile: (415) 693-0770
        cmicheletti@zelle.com
        hrankie@zelle.com

Garrett W. Wotkyns*
John J. Nestico*
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
8501 N. Scottsdale Rd., Suite 270
Scottsdale, Arizona  85253
Telephone: (480) 428-0145
Facsimile: (866) 505-8036
gwotkyns@schneiderwallace.com
jnestico@schneiderwallace.com

Todd Schneider*
Mark Johnson*
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
180 Montgomery Street, Ste. 2000
San Francisco, California  94104
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
mjohnson@schneiderwallace.com

Todd S. Collins*
Shanon J. Carson*
Ellen T. Noteware*
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365
Telephone: (215) 875-3000
tcollins@bm.net
scarson@bm.net
enoteware@bm.net

*Pro Hac Vice application forthcoming

*Attorneys for Plaintiffs*