UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KATHERINE FLEMING, EDWARD R.
HADUCK, and VICTORIA WENDEL,

Plaintiffs,

v.

FIDELITY MANAGEMENT TRUST
COMPANY, FIDELITY INVESTMENTS
INSTITUTIONAL OPERATIONS
COMPANY, INC.,

Defendants.

Civil Action No. 16-10918-ADB

**Oral Argument Requested**

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' COMPLAINT UNDER FED. R. CIV. P. 12(b)(6)**

James R. Carroll (BBO #554426)
Michael S. Hines (BBO #653943)
SKADDEN, ARPS, SLATE
MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
michael.hines@skadden.com

Alison V. Douglass (BBO #646861)
Jaime A. Santos (BBO #689946)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
adouglass@goodwinprocter.com
jsantos@goodwinprocter.com

*Attorneys for Defendants*

Dated: July 22, 2016

## TABLE OF CONTENTS

**Page**

**INTRODUCTION**................................................................................................................1

**BACKGROUND** ................................................................................................................3

I.      The Delta Plan and Its Relationship to Fidelity. .......................................................3

        A.      Delta—Not Fidelity—Elected To Offer BrokerageLink To Participants...............4

        B.      Delta—Not Fidelity—Elected To Offer FE's Services To Participants .................5

II.     Plaintiffs' Complaint.................................................................................................6

**LEGAL STANDARD** ........................................................................................................7

**ARGUMENT** ....................................................................................................................8

I.      Two Courts of Appeals Have Rejected "Product Design" Claims Nearly Identical to Count III's BrokerageLink Claim Because Service Providers Are Not Liable as Fiduciaries for Their Fees or the Design of Their Products.................................................8

II.     Plaintiffs' Fiduciary Breach Claim Concerning Fidelity's FE Compensation (Count I) Fails. .......................................................................................................................13

        A.      Count I Is Based on a Demonstrably False Factual Premise, as Plaintiffs Would Have Known with Even a Modicum of Pre-Filing Investigation. .............13

        B.      Plaintiffs Do Not—and Cannot—Plead that Fidelity Has Any Fiduciary Responsibility to the Plan for the Selection of FE or the Fees It Receives from FE. ...................................................................................................15

III.    Fidelity's Receipt of Compensation Does Not Support Plaintiffs' Prohibited Transaction Claims. ..............................................................................................17

        A.      Plaintiffs Fail to Plead a § 406(b) Fiduciary Prohibited Transaction Claim..........17

        B.      Plaintiffs Fail to Plead a Non-Fiduciary 406(a) Prohibited Transaction Claim.................................................................................................................20

                1.      Plaintiffs' Allegations About Fidelity's Receipt of Compensation from BrokerageLink Mutual Funds and from FE Do Not Plead a Transaction Subject to ERISA § 406(a)....................................................20

                2.      Plaintiffs Are Not Entitled to the Relief They Seek. ................................22

**CONCLUSION** .................................................................................................................22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................................7, 8, 15

*Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*,
941 F.2d 561 (7th Cir. 1991) ......................................................................................16

*Beddall v. State St. Bank & Tr. Co.*,
137 F.3d 12 (1st Cir. 1998) ........................................................................................4, 8

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .......................................................................................................8

*Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*,
474 F.3d 463 (7th Cir. 2007) ......................................................................................18

*Columbia Air Servs., Inc. v. Fidelity Mgmt. Trust Co.*,
Civ. A. No. 07-11344, 2008 WL 4457861 (D. Mass. Sept. 30, 2008) ............................12, 16

*Cottrill v. Sparrow, Johnson & Ursillo, Inc.*,
74 F.3d 20 (1st Cir. 1996) ........................................................................................9, 13

*Danza v. Fidelity Mgmt. Trust Co.*,
533 F. App'x 120 (3d Cir. 2013) ....................................................................16, 18, 20, 21

*F.H. Krear & Co. v. Nineteen Named Trustees*,
810 F.2d 1250 (2d Cir. 1987) ........................................................................................12, 16

*Farley v. Shaw's Supermarkets, Inc.*,
497 F. Supp. 2d 23 (D. Mass. 2007) ...........................................................................8

*In re Fidelity ERISA Float Litig.*,
__ F.3d __, 2016 WL 3748685 (1st Cir. July 13, 2016) ..............................3, 4, 8, 18, 19, 20

*Fifth Third Bancorp. v. Dudenhoeffer*,
134 S. Ct. 2459 (2014) ...............................................................................................3, 8

*Foley v. Wells Fargo Bank, N.A.*,
772 F.3d 63 (1st Cir. 2014) .........................................................................................8

*García-Catalán v. United States*,
734 F.3d 100 (1st Cir. 2013) .......................................................................................7

86066233

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) .......................................................................................11, 15, 19

*IATSE Local 33 Section 401(k) Plan Bd. of Trs. v. Bullock*,
  No. 08-3949, 2008 WL 4838490 (C.D. Cal. Nov. 5, 2008) ....................................................18

*Kling v. Fidelity Mgmt. Trust Co.*,
  270 F. Supp. 2d 121 (D. Mass. 2003) ........................................................................................4

*Leimkuehler v. Am. United Life Ins. Co.*,
  713 F.3d 905 (7th Cir. 2013) ....................................................2, 5, 9, 10, 11, 12, 13

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996)............................................................................................20, 21, 22

*McCaffree Fin. Corp. v. Principal Life Ins. Co.*,
  811 F.3d 998 (8th Cir. 2016) .......................................................................................11, 12, 16

*Merrimon v. Unum Life Ins. Co. of Am.*,
  758 F.3d 46 (1st Cir. 2014).........................................................................................20

*Ocasio–Hernández v. Fortuño-Burset*,
  640 F.3d 1 (1st Cir. 2011).............................................................................................14

*Olabode v. Caliber Home Loans, Inc.*,
  No. 15-10146, 2015 WL 4111439 (D. Mass. July 8, 2015) ....................................................14

*PBGC v. Morgan Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013)................................................................................8, 14, 15

*Pegram v. Herdrich*,
  530 U.S. 211 (2000)..........................................................................................8, 9, 13

*Pereyra v. Sedky*,
  148 F. Supp. 3d 134 (D. Mass. 2015) ......................................................................................8

*Reich v. Rowe*,
  20 F.3d 25 (1st Cir. 1994)............................................................................................22

*Renfro v. Unisys Corp.*,
  671 F.3d 314 (3d Cir. 2011)..................................................................................1, 11, 15

*Santomenno v. John Hancock Life Ins. Co. (USA)*,
  768 F.3d 284 (3d Cir. 2014)............................................................1, 2, 9, 10, 11, 12, 13, 15

*Seaway Food Town, Inc. v. Med. Mut. of Ohio*,
  347 F.3d 610 (6th Cir. 2003) .......................................................................................16

iii

*United Teamster Fund v. MagnaCare Admin. Servs., LLC*,
    39 F. Supp. 3d 461 (S.D.N.Y. 2014) ............................................................................16

**Statutes**

Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*
    29 U.S.C. § 1002(14) (ERISA § 3(14)) ....................................................................21

    29 U.S.C. § 1002(21)(A) (ERISA § 3(21)(A)) ..........................................................9

    29 U.S.C. § 1024(b)(4) (ERISA § 104(b)(4)) ......................................................4, 14

    29 U.S.C. § 1101(b)(1) (ERISA § 401(b)(1)) ...........................................................18

    29 U.S.C. § 1106(a) (ERISA § 406(a)) ........................................................17, 18, 21

    29 U.S.C. § 1106(a)(1)(C) (ERISA § 406 (a)(1)(C)) ............................17, 20, 21, 22

    29 U.S.C. § 1106(a)(1)(D) (ERISA § 406(a)(1)(D)) .........................................17, 20

    29 U.S.C. § 1106(b) (ERISA § 406(b)) ........................................................17, 18, 20

    29 U.S.C. § 1106(b)(1) (ERISA § 406(b)(1)) ...........................................................17

    29 U.S.C. § 1106(b)(3) (ERISA § 406(b)(3)) ...........................................................17

    29 U.S.C. § 1108(b)(2) (ERISA § 408(b)(2)) ...........................................................21

    29 U.S.C. § 1109 (ERISA § 409)) ............................................................................22

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................................................................................1, 3, 4, 8

**Other Authorities**

H.R. Rep. No. 93-533, at 11 (1973) .............................................................................14

H.R. Rep. No. 93-1280, at 296 (1974) .........................................................................18

Defendants Fidelity Management Trust Company and Fidelity Investments Institutional Operations Company (collectively, "Fidelity") submit this Memorandum in Support of Their Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(6).  The Complaint fails to state a claim as a matter of law under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*

## INTRODUCTION

Plaintiffs' breach of fiduciary duty claims (Counts I and III) suffer from an incurable legal flaw that requires dismissal as a matter of law.  Plaintiffs' central allegation is that Fidelity—a service provider to Plaintiffs' 401(k) plan—offers products to the plan that yield compensation to Fidelity at a rate that Plaintiffs deem to be too high.  This allegation does not state a claim.  Four federal courts of appeals have ruled that a 401(k) plan service provider that merely offers products and services that an employer can select or reject for its plan "owes no fiduciary duty to a plan with respect to the terms of its service agreement," and that "a service provider [to a plan] 'owes no fiduciary duty with respect to the negotiation of its fee compensation.'"  *E.g.*, *Santomenno v. John Hancock Life Ins. Co. (USA)*, 768 F.3d 284, 293-96 (3d Cir. 2014) (*quoting Renfro v. Unisys Corp.*, 671 F.3d 314, 324 (3d Cir. 2011)).  A party that is not a fiduciary cannot be liable for breach of fiduciary duty.

Plaintiffs complain about two unrelated, optional 401(k) plan products made available to participants in the Delta 401(k) plan:  BrokerageLink®, a brokerage "window" product offered by Fidelity through which plan participants can choose from thousands of mutual funds and other securities beyond the investment options offered in their plan's standard investment lineup; and Financial Engines (FE), an optional service that provides investment advice to individual plan participants.

As to BrokerageLink, Plaintiffs say that Fidelity selected for inclusion certain mutual fund share classes that, in Plaintiffs' view, pay Fidelity too high a rate of compensation. The Third and Seventh Circuits have rejected virtually identical ERISA claims because "'product design' features," expressly including the selection of mutual fund share classes, "do not give rise to a fiduciary duty" on the part of a service provider (like Fidelity) where the employer (like Delta) is free to reject the product and "select[] another service provider." *Santomenno*, 768 F.3d at 295-96 (affirming dismissal of ERISA claims against provider); *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 912 (7th Cir. 2013) ("the act of selecting both funds and their share classes for inclusion on a menu of investment options offered to 401(k) plan customers does not transform a provider of [an investment product] into a[n ERISA] fiduciary").

As to FE, an investment advisor wholly unaffiliated with Fidelity, Plaintiffs sensationally—but baselessly—allege that Fidelity is involved in a "pay-to-play" scheme with FE, under which Fidelity gives 401(k) plans "no choice" but to use FE as the "exclusive" investment advisor for plan participants, and thus that the fees Fidelity earns from FE are a "kick-back" for channeling plans into FE. But the contract between Delta and Fidelity—which Plaintiffs have a statutory right to obtain from their employer—makes clear that it is Delta, not Fidelity, that selected FE, and that Fidelity was contractually precluded from having any role in that decision. Indeed, it is a matter of public record that Fidelity offers *its own* investment advice service that competes directly against FE, rendering Plaintiffs' allegation that Fidelity requires 401(k) plans to use FE (Fidelity's competitor) not only implausible but utterly nonsensical. These facts would have been apparent to Plaintiffs with even minimal pre-suit investigation.

Plaintiffs' prohibited transaction claims fail to plead essential elements of an ERISA prohibited transaction because, among other reasons, (i) Fidelity's receipt of revenue *from*

*mutual funds* via BrokerageLink and *from FE* do not constitute transactions "with a plan;" and (ii) "plan assets," which are defined under "ordinary notions of property rights," *In re Fidelity ERISA Float Litig.*, __ F.3d __, 2016 WL 3748685, at *4 (1st Cir. July 13, 2016), do not include monies owned by a mutual fund or by FE (which are the assets of the mutual fund or FE).

In short, this is precisely the sort of complaint that Justice Breyer envisioned when he noted that Rule 12(b)(6) is an "important mechanism for weeding out meritless claims" in ERISA cases. *Fifth Third Bancorp. v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014). Indeed, the First Circuit has expressed a particular skepticism of claims concerning service provider arrangements agreed to by the plan that are brought by individual plan participants, but—like here—are not joined by the plan sponsor (Delta), because it is "likely" that "the behavior complained of is nothing other than what the plan[] expected." *In re Fidelity ERISA Float Litig.*, 2016 WL 3748685, at *1.

## BACKGROUND

### I.     The Delta Plan and Its Relationship to Fidelity.

Plaintiffs participate in a 401(k) plan sponsored by their employer, Delta Airlines (the "Delta Plan"). Delta is the "plan sponsor" and Plaintiffs are "plan participants." The Delta Plan allows plan participants to establish, contribute to, and invest their individual plan accounts in investment options designated by Delta. Compl. ¶ 4.

Delta, which is not a party to this lawsuit, hired Fidelity to perform recordkeeping and related services for the Delta Plan pursuant to the terms of a contract known as a trust agreement. *Id.* ¶ 26. The Delta Trust Agreement ("Delta TA") is submitted herewith as Exhibit A to the

Declaration of Alison V. Douglass in Support of Defendants' Motion to Dismiss ("Douglass Decl.").[1]

### A.       Delta—Not Fidelity—Elected To Offer BrokerageLink To Participants

Delta plan participants can select among two tiers of choices when deciding where to invest their 401(k) accounts.  First, the Delta Plan offers a "core" menu of approximately two dozen mutual funds and other investment options from which plan participants may choose to invest their plan accounts.  *See* Douglass Decl. Ex. A (Delta TA) Schedule C.  Second, although ERISA does not require plans to offer "brokerage windows," Delta has also chosen to offer its participants the option to invest via Fidelity's BrokerageLink® product, which provides participants access to many thousands of mutual funds, stocks, and other securities.  Compl. ¶¶ 8-9.

The Delta TA is clear that it is Delta, not Fidelity, that has chosen to make the BrokerageLink product available to Delta plan participants.  The TA states that Delta "shall determine the type of Plan investment options to be offered to Participants" and that Fidelity "shall have no responsibility for the selection of investment options."  Douglass Decl. Ex. A (Delta TA) § 5(a)-(b) & Amendment 10.  Pursuant to the Delta TA, Delta selected the investment options for the Delta Plan as set forth in Schedule C of the Delta TA, which includes BrokerageLink.  Compl. ¶¶ 8-9; Douglass Decl. Ex. A (Delta TA) Schedule C.  Delta had no

---

[1] When examining the sufficiency of Plaintiffs' complaint, this Court may look to the trust agreement, which the First Circuit has held is central to disputes regarding a trustee and the services it provides to an ERISA plan.  *See, e.g.*, *In re Fidelity ERISA Float Litig.*, 2016 WL 3748685, at *4 (considering trust agreement attached to motion to dismiss in affirming dismissal of claims against service provider); *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998) (holding that the district court appropriately considered the trust agreement in resolving ERISA liability on a motion to dismiss, noting that "[w]hen, as now, a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)"); *Kling v. Fidelity Mgmt. Trust Co.*, 270 F. Supp. 2d 121, 128 (D. Mass. 2003), *modified in unrelated part*, 291 F. Supp. 2d 1 (D. Mass. 2003).  Plan trust agreements are considered written instruments under which ERISA plans are operated and are available to plan participants upon request.  29 U.S.C. § 1024(b)(4).

4

obligation to offer BrokerageLink in the first place and has the "right to terminate" the

BrokerageLink product offering at any time, without penalty. *Id.* Participants are also not

required to invest in BrokerageLink, but instead may choose from among the core options

designated by Delta.

The Delta TA also sets forth Fidelity's compensation. With respect to BrokerageLink,

Schedule B to the TA discloses that Fidelity receives fees described in a commission schedule.

Douglass Decl. Ex. A (Delta TA) Schedule B-Section I ("*Investment Services – Self-directed*

*brokerage*" referring to "separate commission schedule"); Douglass Decl. Ex. B (BrokerageLink

Commission Schedule) at Addendum. The BrokerageLink Commission Schedule discloses that

Fidelity may receive payments from mutual funds that make their shares available to plan

participants on the BrokerageLink platform. Douglass Decl. Ex. B at Addendum; Compl. ¶¶ 12-

13.[2] These fees, referred to as "revenue-sharing payments," compensate 401(k) plan

recordkeepers (like Fidelity) for performing the recordkeeping work that the mutual fund or its

manager would have to do itself if there were no recordkeeper. *See Leimkuehler*, 713 F.3d at

908-10, for a further explanation of this "commonplace" 401(k) practice.

### B.  Delta—Not Fidelity—Elected To Offer FE's Services To Participants

Plan sponsors may also elect to offer a professional investment advice service to assist

individual participants in allocating assets among the plan's "core" investment options. Fidelity

offers a proprietary investment advice product called Fidelity® Portfolio Advisory Service at

Work ("PAS-W").[3] Delta did not elect Fidelity's PAS-W product. Rather, Delta hired FE, a

---

[2] The Complaint alleges in some instances that revenue sharing payments are made by the mutual funds, and in other instances that such payments are made by mutual fund managers. *See, e.g.*, Compl. ¶¶ 12, 13, 17, 78. For simplicity, Fidelity refers to such payments as from the mutual funds, as it is irrelevant to the legal analysis whether they are from the mutual funds themselves, or from the fund managers; all that is relevant is that the payments are not from the plan. *See infra* pp. 18-19.

[3] *See* https://workplace.fidelity.com/managed-accounts.html; *See* Douglass Decl. Ex. C (March 30, 2016 Form ADV for Fidelity affiliate Strategic Advisers, Inc., and ADV Part 2 brochure for Fidelity Portfolio Advisory Service at

third-party investment advisor that has no affiliation with Fidelity other than that created by contract. Douglass Decl. Ex. A (Delta TA) Amendment 2 (discussing Delta's appointment of FE). The Delta TA leaves no question that this decision was solely Delta's. The Delta TA specifically references "a financial services agreement between [Delta] and [FE]" under which *Delta* elected FE as "a discretionary investment management services provider," a decision for which the parties agreed that Fidelity "*shall have no responsibility.*" *Id.* Amendment 2 § (1)(tt) (emphasis added).

Because FE wished to make its services available to plan sponsors through Fidelity's proprietary recordkeeping platform and interface with Fidelity's systems, FE has a contract with Fidelity in order to facilitate FE's provision of advice services to participants. Compl. ¶¶ 6, 35. FE pays fees to Fidelity pursuant to this contract. *Id.*

## II. Plaintiffs' Complaint.

Plaintiffs' claims challenge the compensation that Fidelity receives as a result of *Delta's decisions* to utilize BrokerageLink and FE in its plan. With respect to BrokerageLink, Plaintiffs allege that Fidelity chose the share classes of funds included in the product, and selected higher-cost "retail" share classes that pay Fidelity more revenue sharing than lower-cost "institutional" share classes would pay. Compl. ¶¶ 11-17. Thus, Plaintiffs claim to be aggrieved by Fidelity's decision to offer to Delta a product containing retail share classes. With respect to FE, Plaintiffs allege that Fidelity hired FE (a competitor of Fidelity's PAS-W) as the exclusive provider of investment advice services for the Delta Plan and received "kick-backs" from FE in return. These "kickbacks" allegedly increased FE's costs such that FE, for its part, entered into contracts with the Delta Plan that caused FE to charge the plan too much. Compl. ¶¶ 6-7, 68. As to each

Work (PAS-W) Terms and Conditions, available at http://www.adviserinfo.sec.gov/IAPD/Part2Brochures.aspx? ORG_PK=104555).

of these claims, the purportedly excessive compensation consists of money paid to Fidelity by a party other than the Delta Plan—money paid by the mutual funds in the context of the BrokerageLink allegations, and money paid by FE in the context of the FE allegations—for services rendered by Fidelity to those non-plan parties.

Plaintiffs assert four counts under ERISA based on these allegations.  In Count I, Plaintiffs contend that Fidelity exercised discretionary, fiduciary authority by selecting and hiring FE for the Delta Plan, and that it breached fiduciary duties to the plan because it negotiated to receive fees from FE that are allegedly "excessive."  Compl. ¶¶ 60-66.  In Count II, Plaintiffs assert that FE—which is not a defendant—breached its own fiduciary duties by charging the Delta Plan excessive fees "for the purpose of transferring plan assets" to Fidelity (the purported "plan assets" being the monies that FE pays to Fidelity) and that Plaintiffs are entitled to recover from Fidelity for FE's alleged breaches.  *Id.* ¶¶ 67-72.  In Count III, Plaintiffs contend that Fidelity exercised discretionary, fiduciary authority by selecting the mutual fund share classes available in BrokerageLink, and that it breached its duty by including share classes that are unduly expensive, causing Fidelity to receive "excessive" compensation from those mutual funds.  *Id.* ¶¶ 72-79.  In Count IV, Plaintiffs assert that Fidelity engaged in "prohibited transactions" by receiving excessive compensation from FE and from the mutual funds offered in BrokerageLink.  *Id.* ¶¶ 80-86.

## **LEGAL STANDARD**

To survive a motion to dismiss, a complaint must contain "factual allegations [that] are sufficient to support the reasonable inference that the defendant is liable for the misconduct alleged."  *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although this Court must take all *well-pleaded* allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation."

7

*Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Moreover, allegations need not be credited if they are contradicted by documents referenced in,

relied upon by, or integral to the complaint.  *See Beddall*, 137 F.3d at 16-17; *Farley v. Shaw's*

*Supermarkets, Inc.*, 497 F. Supp. 2d 23, 26 (D. Mass. 2007).

        In the context of ERISA claims, courts have acknowledged the extraordinary, asymmetric

burden caused by discovery and the risk that an ERISA "plaintiff[] with a largely groundless

claim [will] simply take up the time of a number of other people, with the right to do so

representing an *in terrorem* increment of the settlement value."  *PBGC v. Morgan Stanley Inv.*

*Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (alteration in original) (quotation marks omitted).

Consequently, the Supreme Court has identified Rule 12(b)(6) as an "important mechanism for

weeding out meritless [ERISA] claims."  *Fifth Third*, 134 S. Ct. at 2471; *see also Pereyra v.*

*Sedky*, 148 F. Supp. 3d 134, 141 (D. Mass. 2015) ("[A] 'primary purpose' of [Rule 12(b)(6)] 'is

to weed out cases that do not warrant reaching the (oftentimes) laborious and expensive

discovery process because, based on the factual scenario on which the case rests, the plaintiff

could never win.'" (quoting *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 72 (1st Cir. 2014))).

The First Circuit has joined these courts, recently affirming dismissal of ERISA claims that rest

on "conclusory legal allegations" refuted by "agreements between the [defendant provider] and

the plans."  *In re Fidelity ERISA Float Litig.*, 2016 WL 3748685, at *3, *5 (citation omitted).

## ARGUMENT

**I.      Two Courts of Appeals Have Rejected "Product Design" Claims Nearly Identical to Count III's BrokerageLink Claim Because Service Providers to a Plan Are Not Plan Fiduciaries for Their Fees or the Design of Their Products.**

        The "threshold question" to Plaintiffs' fiduciary claim concerning Fidelity's

BrokerageLink compensation (Count III) is whether Fidelity "was acting as a fiduciary (that is,

was performing a fiduciary function) *when taking the action subject to complaint.*"  *Pegram v.*

*Herdrich*, 530 U.S. 211, 226 (2000) (emphasis added).  An entity is a fiduciary of a plan only "to the extent" it possesses or exercises certain authority over the plan or its assets, 29 U.S.C. § 1002(21)(A); it does not have such authority where "ultimate decision-making authority rests elsewhere."  *Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 74 F.3d 20, 22 (1st Cir. 1996) ("discretion [is] a *sine qua non* of fiduciary duty" under ERISA).  Applying this rule, circuit courts have long held that 401(k) service providers do not have fiduciary duties when negotiating their own compensation, and that rule has recently been applied by two courts of appeal to "product design" challenges just like Plaintiffs' complaint about BrokerageLink.

Here it was Delta, not Fidelity, that elected to include Fidelity's BrokerageLink product as an investment option in the Delta Plan.  Douglass Decl. Ex. A (Delta TA) Schedule C; *supra* pp. 8-9.  Delta is not obligated to offer any brokerage window in its plan, and obviously is not obligated to use Fidelity as recordkeeper.  Plaintiffs nonetheless claim that Fidelity was a fiduciary to the Delta Plan when it designed the BrokerageLink product and made it available to plans, and that it breached its fiduciary duty because it designed BrokerageLink to include (among many other securities[4]) mutual fund share classes more expensive than those it could have offered (*i.e.*, share classes that pay higher levels of "revenue sharing" to Fidelity).  Compl. ¶ 15.  The Seventh and Third Circuits considered—and rejected—this very same theory of ERISA liability in *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905 (7th Cir. 2013), and *Santomenno v. John Hancock Life Ins. Co. (USA)*, 768 F.3d 284 (3d Cir. 2014).

In *Leimkuehler*, the defendant (AUL) —a service provider—offered a menu of investment options to 401(k) plans.  713 F.3d at 908.  "For each fund on the menu AUL also selected a particular share class . . . ."  *Id.* at 909-10.  The plaintiff alleged that by deciding which

---

[4] Plaintiffs concede that their complaint about overpriced share classes relates to only some of the investment options available through BrokerageLink.  Compl. ¶ 54.

share classes of funds to make available on its menu, AUL was acting as a fiduciary of the plan, and that by selecting higher-cost share classes, AUL breached fiduciary duties to the plan. *Id.* at 910. The *Leimkuehler* district court rejected the plaintiff's theory and the Seventh Circuit affirmed.

The Seventh Circuit observed that the plaintiff's "'product design' theory . . . center[ed] on actions that AUL takes when designing the products it offers to its 401(k) plan customers," which include "decid[ing] which mutual funds to include and which share classes of those funds to select." 713 F.3d at 911. The court held that such "product-design decisions" did not make AUL an ERISA fiduciary because the plan sponsor "was free to seek a better deal with a different 401(k) service provider if he felt that AUL's investment options were too expensive." *Id.* at 912. "[T]he act of selecting both funds and their share classes for inclusion on a menu of investment options offered to 401(k) plan customers does not transform [an investment provider] into a functional fiduciary." *Id.*[5]

The Third Circuit rejected the very same product design theory in affirming the grant of a motion to dismiss in *Santomenno*. The provider in *Santomenno* (John Hancock) likewise offered 401(k) plan sponsors a menu of investment options composed of mutual funds. 768 F.3d at 288. Among other things, the plaintiffs complained that John Hancock's menu did not offer the lowest-cost share class of funds. *Id.* at 292. The district court dismissed these claims, holding "that John Hancock was not an ERISA fiduciary with respect to any of the misconduct alleged in the complaint." *Id.* at 290. In affirming, the Third Circuit observed that "[o]nly discretionary acts . . . trigger fiduciary duties," and recited the well-established rule that a service provider

---

[5] The *Leimkuehler* court also discussed the important role that revenue sharing plays in covering the costs associated with providing services to a 401(k) plan—a fact about this widely-used fee mechanism that Plaintiffs here purposefully ignore when they imply that revenue sharing is a nefarious practice. *Leimkuehler*, 713 F.3d at 909 (revenue sharing is a "widely known" and "commonplace" industry practice "intended to cover the costs of providing the participant-level services that the mutual fund would be furnishing if it were not for AUL").

"owes no fiduciary duty with respect to the negotiation of its fee compensation . . . if it does not control the named fiduciary's negotiation and approval of those terms."  768 F.3d at 293 (quoting *Renfro v. Unisys Corp.*, 671 F.3d 314, 324 (3d Cir. 2011), and *Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009)); *see also McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1003 (8th Cir. 2016) ("service provider's adherence to its agreement with a plan administrator does not implicate any fiduciary duty where the parties negotiated and agreed to the terms of that agreement in an arm's-length bargaining process").  Applying these principles, the Third Circuit held that John Hancock was "not a fiduciary with respect to the manner in which it composed" its investment menu, "including its selection of investment options and the accompanying fee structure."  *Id.* at 295.  As in *Leimkuehler*, John Hancock's selection of funds and share classes was a "product design" feature, and "selecting which funds will be included in a particular 401(k) investment product, without more, does not give rise to a fiduciary responsibility" where "[n]othing prevented the [plan sponsors] from rejecting [the] product and selecting another service provider; the choice was theirs."  *Id.*

The *Leimkuehler* and *Santomenno* decisions rejecting share class selection claims relied on general principles established by several circuit courts dismissing ERISA excessive fee claims on the grounds that a service provider does not exercise discretionary decision-making authority over a plan when it designs and offers an investment product that the plan sponsor is free to accept or reject.  *See Hecker*, 556 F.3d at 583 (401(k) plan sponsor had "final say on which investment options will be included" in the plan); *Renfro*, 671 F.3d at 323 (trust agreement "expressly disclaimed any role for [provider] Fidelity in selecting investment options" for the plan).  The Eighth Circuit also recently held that a provider's product design decisions did not constitute an exercise of discretionary authority over the plan because the plan sponsor

11

"remained free to reject [the provider's] terms and contract with an alternative service provider offering more attractive pricing or superior investment products." *McCaffree*, 811 F.3d at 1003; *see also F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir. 1987) ("When a person who has no relationship to an ERISA plan is negotiating a contract with that plan, he has no authority over or responsibility to the plan and presumably is unable to exercise any control over the trustees' decision whether or not, and on what terms, to enter into an agreement with him."). As all of these cases hold, if the service provider has no discretionary decision-making authority over the choice to utilize or not utilize a product or service in the plan, it is not a fiduciary to the plan. And, in the absence of a fiduciary duty, it cannot be sued for breach of that duty. *Accord Columbia Air Servs., Inc. v. Fidelity Mgmt. Trust Co.*, Civ. A. No. 07-11344, 2008 WL 4457861, at *4-5 (D. Mass. Sept. 30, 2008) (O'Toole, J.) (dismissing excessive fee claims because the plan sponsor, and not Fidelity, made the discretionary decisions for the plan).

Plaintiffs' allegations in this case–that Fidelity had "authority to select the share classes of mutual funds" available through BrokerageLink (Compl. ¶ 76) and is therefore responsible as a fiduciary for its BrokerageLink compensation—are *indistinguishable* from the allegations in *Leimkuehler* and *Santomenno* and should be dismissed on identical legal grounds. Fidelity's selection of share classes to be offered in BrokerageLink is a "product design" feature of a product that plan sponsors may select or reject when they enter into a trust agreement with Fidelity under which plan sponsors such as Delta have the exclusive authority to "determine the type of Plan investment options to be offered to Participants." Delta TA § 5(b).[6] If Delta or any other plan sponsor does not like this product feature, they can decline to offer a brokerage

---

[6] Indeed, nothing prevents Delta from terminating BrokerageLink at any time, with no penalty, if it is at any point dissatisfied with Fidelity's product design. Delta TA § 5(g), Douglass Decl. Ex. A.

window at all, or "select[] another service provider," *Santomenno*, 768 F.3d at 295, that offers a

different kind of brokerage window.  As the Seventh and Third Circuits held, such design

features therefore do not confer upon Fidelity any discretionary decision-making authority as to

any particular plan, which is the "*sine qua non*" of ERISA fiduciary status.  *Cottrill*, 74 F.3d at

22.  Plaintiffs' Count III—like the claims in *Leimkuehler* and *Santomenno*—therefore fails as a

matter of law.

## II.     Plaintiffs' Fiduciary Breach Claim Concerning Fidelity's Compensation from FE (Count I) Fails.

Plaintiffs also allege that Fidelity acted as a fiduciary to the Delta Plan by "hiring" FE as

the exclusive investment advice provider to the plan for the purpose of receiving illegal "kick-

backs" from FE under a "pay-to-play" scheme.  Compl. ¶¶ 7, 64.  The "threshold question" of

this fiduciary claim is, once again, whether Fidelity "was performing a fiduciary function[] when

taking the action subject to complaint."  *See Pegram*, 530 U.S. at 226; Compl. ¶ 65.  Plaintiffs'

breach of fiduciary duty claim regarding FE fails because it relies on a demonstrably false factual

premise and fatally flawed legal theories.

### A.      Count I Is Based on a Demonstrably False Factual Premise, as Plaintiffs Would Have Known with Even a Modicum of Pre-Filing Investigation.

Plaintiffs' claims concerning Fidelity's receipt of compensation from FE are premised

entirely on the factual allegations that Fidelity "hired" FE for the plan as the "exclusive"

investment advice provider whom the plan had "no choice" but to use, and was able to extract

unlawful "kick-backs" from FE in return for channeling this advisory business to them.  Compl.

¶¶ 7, 29, 33-34.  But, as demonstrated by the Delta TA, those allegations are demonstrably false.

*First*, the Delta TA is clear that it was *Delta—not Fidelity*—that elected the

"discretionary investment management service provided by Financial Engines," and that it was

Delta that hired FE pursuant to "a financial services agreement *between [Delta] and Financial*

*Engines.*"  Douglass Decl. Ex. A (Delta TA) Amendment 2 § (1)(tt) (emphasis added).  Fidelity

has "*no responsibility for . . . the decision to offer*" such advice services or "*the selection of such

. . . service.*"  *Id.* (emphases added).  Where Fidelity had "no responsibility" and no authority to

hire FE, Fidelity plainly could not have required the plan to use FE, much less demanded a

"kick-back" for doing so.

Plaintiffs' allegations are particularly irresponsible given that even minimal pre-suit

investigation would have made plain that the factual premise of Count I is false.  The Delta TA

was readily accessible to Plaintiffs because it is one of several documents that plan participants

have a statutory right to request from their plan administrator.  *See* ERISA § 104(b)(4), 29

U.S.C. § 1024(b)(4) (plan administrator must furnish copy of trust agreement upon request of

any participant).  The very purpose of ERISA's disclosure provision is to "giv[e] plan

beneficiaries (*i.e.*, prospective plaintiffs) the opportunity to" find the facts necessary to determine

whether or not they have a claim.  *PBGC*, 712 F.3d at 720; *see also* H.R. REP. No. 93-533, at 11

(1973), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4649 (ERISA's disclosure provisions "arm[]

[participants] with enough information to enforce their own rights as well as the obligations

owed by the fiduciary").

*Second*, the existence of Fidelity's PAS-W investment advice product as an alternative to

FE is public information available to Plaintiffs through a Google search or a review of Fidelity's

SEC filings concerning PAS-W—on the same Form ADV that Plaintiffs cite in paragraph 37 of

their Complaint.  *See supra* note 3.  As this Court has observed, "evaluating the plausibility of a

legal claim requires the reviewing court to draw on . . . common sense."  *Olabode v. Caliber

Home Loans, Inc.*, No. 15-10146, 2015 WL 4111439, at *4 (D. Mass. July 8, 2015) (citing

*Ocasio–Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011)).  The fact that Fidelity

offers its own competing investment advice product renders implausible, if not nonsensical, Plaintiffs' allegations about an "exclusive" arrangement under which Fidelity holds plans captive to FE.  Compl. ¶ 33.

Plaintiffs clearly had easy access to documents that foreclose their sensational theory of an illegal kick-back scheme between FE and Fidelity.  Their willful ignorance of the basic—and readily knowable—facts concerning Delta's retention of FE is reckless and should not entitle Plaintiffs to "unlock the doors of discovery," *Iqbal*, 556 U.S. at 678, and force Fidelity to submit to "probing and costly inquiries and document requests."  *PBGC*, 712 F.3d at 719.  These same facts also refute any allegation that Fidelity bore any ERISA fiduciary responsibility for the Delta Plan's use of FE where the Delta TA places sole responsibility on Delta for selecting FE. Count I fails on this basis alone.

**B.     Plaintiffs Do Not—and Cannot—Plead that Fidelity Has Any Fiduciary Responsibility to the Plan for the Selection of FE or the Fees It Receives from FE.**

Even if it were not demonstrably false, Plaintiffs' allegation that Fidelity required plans using Fidelity's recordkeeping system to use FE, Compl. ¶¶ 33, 34, 64, would not make out a valid claim that Fidelity is a fiduciary as to Delta's choice of FE.  At bottom, Plaintiffs' allegation is that FE is simply part and parcel of Fidelity's recordkeeping service platform—that plans that choose Fidelity must utilize FE if they wish to provide investment advice services to their plan participants, just like they must use Fidelity's recordkeeping system if they hire Fidelity as recordkeeper.  As set forth in the cases cited in Section I, *supra*, even if a plan service provider, such as a recordkeeper like Fidelity, offers only one alternative for a particular product or service, it is not a fiduciary as to the product design features of its offering so long as the plan fiduciaries have the option to "reject[ the service provider's] product and select[] another service provider."  *Santomenno*, 768 F.3d at 295.  In such instances, it is the plan fiduciary, not the

service provider, that has ultimate decisionmaking authority.  Accordingly, even if the Court were to indulge *arguendo* the assumption that Fidelity required plans using Fidelity to also use FE, that would not make Fidelity a fiduciary as to the choice of FE, because the Complaint does not allege that plans lacked the ability to walk away from either Fidelity or FE.

Moreover, the one thing that Fidelity is alleged to have done wrong here is negotiate to be paid too much money by FE.  As at least four Courts of Appeals have ruled, this would not state a claim even if Plaintiffs alleged that Fidelity had negotiated to be paid too much *by the plan.*  A service provider "is not an ERISA fiduciary with respect to the terms of the agreement for his compensation."  *F.H. Krear*, 810 F.2d at 1259; *see also McCaffree*, 811 F.3d at 1003 (service provider "did not owe . . . a fiduciary duty while negotiating the fee terms"); *Danza v. Fidelity Mgmt. Trust Co.*, 533 F. App'x 120, 124 (3d Cir. 2013) (affirming dismissal of claims because "at the point that [the service provider] was negotiating its fees . . . it was not a fiduciary of the plan and . . . had no fiduciary duty to Plaintiff that could have been breached"); *Seaway Food Town, Inc. v. Med. Mut. of Ohio*, 347 F.3d 610, 619 (6th Cir. 2003) (adherence to contract term negotiated at arm's length does not give rise to ERISA fiduciary status); *see also Columbia Air*, 2008 WL 4457861, at *4-5 (dismissing excessive fee claims because Fidelity not a fiduciary for "the terms of its engagement"); *United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 470 (S.D.N.Y. 2014) ("contractors that receive contractually-established commission rates are not fiduciaries as to their compensation" (citations omitted)).  If Fidelity could not be sued for breach of fiduciary duty had it charged *the Delta Plan* too much, it certainly cannot be a fiduciary when it purportedly charges *FE* too much.[7]

---

[7] Plaintiffs' sensational suggestion that Fidelity's receipt of fees from FE was a "kick-back" does not change the analysis. Compl. ¶ 7.  "[T]here is no 'kickback'" when "two independent entities agree between themselves as to the payment to be made for services rendered."  *Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 570 (7th Cir. 1991).

Count I's factually baseless and legally deficient breach of fiduciary duty claim should be dismissed.

### III. Plaintiffs' Prohibited Transaction Allegations Lack Elements Essential to Those Claims.

Plaintiffs also allege that Fidelity's receipt of compensation from mutual funds in BrokerageLink and from FE violated ERISA's "prohibited transaction" rules.  Counts I-III allege violations of ERISA § 406(b), 29 U.S.C. § 1106(b); Counts II and IV allege violations of ERISA § 406(a), 29 U.S.C. § 1106(a).[8]  These claims fail because the Complaint does not and cannot allege essential elements of either claim.  For Plaintiffs to state a § 406(b) claim, Fidelity must be a fiduciary, and the challenged transaction must involve plan assets.  But here Fidelity is not a fiduciary with respect to the Plan's use of BrokerageLink or FE, and the payments to Fidelity by the mutual funds and by FE are not plan assets.  To state a § 406(a) claim, Plaintiffs must additionally allege a transaction with the plan that was caused by a "fiduciary."  These essential elements are all missing.

#### A. Plaintiffs Fail to Plead a § 406(b) Fiduciary Prohibited Transaction Claim.

Plaintiffs assert that Fidelity's receipt of payments from FE and from the mutual funds in BrokerageLink violates §§ 406(b)(1) and 406(b)(3), the statutory provisions that prohibit certain transactions to which "a fiduciary" is a party, and which involve "assets of the plan."  29 U.S.C. § 1106(b)(1), (3).[9]  These claims fail because (i) Fidelity is not a fiduciary with respect to the transactions complained of, and (ii) money paid by mutual funds or FE to Fidelity is not a "plan

---

[8] Count II appears to allege a violation of ERISA § 406(a)(1)(D), which prohibits a transaction that "constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest."  Compl. ¶ 68 ("FE, as a fiduciary to the Plaintiffs . . . charged unreasonably excessive fees for the purpose of transferring plan assets to or for the benefit of Fidelity as a party-in-interest to the Plans.").  Count IV pleads a violation of § 406(a)(1)(C).  Compl. ¶¶ 81, 84.

[9] Section 406(b)(1) prohibits a plan fiduciary from self-dealing with assets of the plan.  29 U.S.C. § 1106(b)(1).  Section 406(b)(3) prohibits a plan fiduciary from receiving "consideration for his own personal account" in connection with a transaction involving the assets of the plan.  29 U.S.C. § 1106(b)(3).

asset."

*First*, Plaintiffs' § 406(b) prohibited transaction claims concerning Fidelity's compensation fail on the same threshold ground that Plaintiffs' fiduciary breach claims fail.  For all of the reasons discussed in Sections I and II.B, *supra*, Fidelity is *not a fiduciary* as to the transactions that are the subject of this Complaint.  *See supra* pp. 9-13, 16-17; *see also Danza*, 533 F. App'x at 126 (rejecting § 406(b) claim concerning provider's compensation because provider not a fiduciary "for purposes of negotiating or collecting its compensation"); *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 472 n.4 (7th Cir. 2007) (service provider which accepted compensation prescribed by an arms-length agreement was not a fiduciary for compensation purposes and therefore not liable under § 406(b)).

*Second*, Plaintiffs' § 406(b) claims in Counts I, II, and III fail for the independent reason that §§ 406(b)(1) and (b)(3) concern transactions involving "assets of the plan," and payments made by FE and by the mutual funds are not payments of assets belonging to the plan.  On a motion to dismiss, the Court "need not credit [a] complaint's statement that [an asset] is a 'plan asset,' for that label represents a legal conclusion, not a factual assertion."  *In re Fidelity ERISA Float Litig.*, 2016 WL 3748685, at *4.  With respect to the payments made to Fidelity by the mutual funds, it is black letter law that a plan owns only the shares of a mutual fund; it is not the owner of the cash that the mutual fund owns.  *See* ERISA § 401(b)(1), 29 U.S.C. § 1101(b)(1) ("In the case of a plan which invests in any security issued by a [mutual fund], the assets of such plan . . . shall not . . . be deemed to include any assets of such [mutual fund].").[10]  The First Circuit recently affirmed the dismissal of ERISA claims against a service provider concerning its

---

[10] This exclusion was intentional.  As Congress explained, mutual funds are already regulated by the Investment Company Act, and mutual fund advisors are already subject to liability under that Act based on the investment advice that they provide to mutual funds; therefore, "it is not considered necessary to apply [ERISA's] fiduciary rules to mutual funds."  H.R. Rep. No. 93-1280, at 296 (1974) (Conf. Rep.), *quoted in IATSE Local 33 Section 401(k) Plan Bd. of Trs. v. Bullock*, No. 08-3949, 2008 WL 4838490, at *6 (C.D. Cal. Nov. 5, 2008).

handling of payments from mutual funds to plan participants, explaining that this provision means exactly what it says.  The cash owned by a mutual fund "is an asset of the mutual fund (not the plan)."  *In re Fidelity ERISA Float Litig.*, 2016 WL 3748685, at *5.  *See also Hecker*, 556 F.3d at 584 ("fees [] collected from the mutual fund's assets . . . [are] not the assets of the Plans").  What's more, the trust agreement included a commission schedule that makes clear that Fidelity would receive this compensation.  Douglass Decl. Ex. A (Delta TA) Schedule B-Section I ("*Investment Services – Self-directed brokerage*" referring to "separate commission schedule"); Douglass Decl. Ex. B (BrokerageLink Commission Schedule).

With respect to the payments made to Fidelity by FE, Plaintiffs' assertion that FE's own assets are plan assets when used to pay Fidelity (Compl. ¶¶ 62, 63) likewise fails.  As the First Circuit has recently reiterated, there is no general ERISA definition of what assets are owned by a plan.  To the contrary, "plan assets" are defined by looking to "ordinary notions of property rights under non-ERISA law."  *In re Fidelity ERISA Float Litig.*, 2016 WL 3748685, at *4 (quoting *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 56 (1st Cir. 2014)).  Thus, a payment that "does not go, and is not intended to go, to the plan itself" is not a plan asset.  *Id.* Here, Fidelity's compensation from FE is paid by FE out of FE's own assets pursuant to a contract between FE and Fidelity to which the Delta Plan is not a party.  The Complaint is devoid of any allegation that would differentiate money in an FE account used to pay Fidelity from other money in that same FE account, or that would allow for even an implication that such money belongs to the plan.  There is simply no ordinary notion of property rights (or of common sense) that supports Plaintiffs' apparent theory that fees collected from the plan by a service provider remain assets of the plan.  Plaintiffs' expansive interpretation of plan assets is not only contrary to First Circuit law, it is simply unworkable, as it has no boundaries; unlike the First

Circuit's common sense approach of looking to "ordinary notions of property rights under non-ERISA law," Plaintiffs' theory would provide no guidance as to when money in a plan service provider's account stops being a plan asset subject to ERISA controls.  Efforts to urge upon the court a far-fetched definition of "plan asset" were rejected in *In re Fidelity ERISA Float Litig.*, and must be rejected here as well.

Accordingly, Plaintiffs' § 406(b) claims in Counts I-III as to Fidelity's BrokerageLink and FE compensation should be dismissed.

**B.      Plaintiffs Fail to Plead a Non-Fiduciary 406(a) Prohibited Transaction Claim.**

Plaintiffs seek in Count IV to hold Fidelity liable for its BrokerageLink and FE compensation as a non-fiduciary under ERISA § 406(a)(1)(C), which concerns certain transactions between a plan and a "party in interest" that are caused by a fiduciary.  29 U.S.C. § 1106(a)(1)(C).  Count IV fails because Plaintiffs do not complain of any transaction with a plan, must less one caused by a fiduciary, and because Plaintiffs are not entitled to the only relief they seek—actual damages (Compl. ¶ 86).[11]

**1.      Plaintiffs' Allegations About Fidelity's Receipt of Compensation from BrokerageLink Mutual Funds and from FE Do Not Plead a Transaction Subject to ERISA § 406(a).**

Essential elements of a claim under § 406(a)(1)(C) include:  (i) that the  transaction alleged to be prohibited is between a plan and a "party in interest," *Danza*, 533 F. App'x at 125; and (ii) "that a fiduciary caused the plan to engage in the allegedly unlawful transaction,"

---

[11] To the extent Plaintiffs vaguely attempt to assert a § 406(a)(1)(D) claim in Count II based on payments that Fidelity receives from FE, *see* Compl. ¶ 68, any such claim fails because § 406(a)(1)(D) requires the transfer to or use of plan assets.  ERISA § 406(a)(1)(D).  As discussed in Section III.A, *supra*, money that Fidelity receives from FE are not plan assets.

*Lockheed Corp. v. Spink*, 517 U.S. 882, 888 (1996).[12]  Plaintiffs do not and cannot meet these requirements.

*First*, in order to fall under the prohibition of § 406, the parties to the transaction must be (i) the plan and (ii) a party in interest (which includes a party providing services to the plan).  *See Danza*, 533 F. App'x at 125.  As discussed above, the Delta Plan is not a party to the transactions in dispute.  Plaintiffs complain about the compensation that Fidelity receives "*from the mutual funds*" and "*from FE*," not any transaction with "the plan."  Compl. ¶ 85.

*Second*, § 406(a) addresses only those transactions between a plan and a party in interest caused by "a fiduciary."  Plaintiffs fail to allege "a fiduciary [that] caused the plan to engage in the allegedly unlawful transaction," and "[u]nless a plaintiff can make that showing, there can be no violation of § 406(a)(1)."  *Lockheed*, 517 U.S. at 888-89.  Specifically, Plaintiffs carefully avoid any suggestion that Delta, which did choose to offer BrokerageLink and FE to its participants, did anything wrong.

These essential elements are essential for a reason—because they focus the statute on what it is that Congress was trying to accomplish.  The Supreme Court has made clear that § 406(a) targets transactions "that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length."  *Lockheed*, 517 U.S. at 893.  Because Fidelity's arrangements for compensation from FE and the mutual fund companies are independent of the plan, they necessarily do not involve insider deals with the plan, the "special risk" at which the statute was directed.  The transactions in dispute here do not meet the statutory elements of a § 406(a)(1)(C) claim, and plainly "[do] not fall into the category of transactions

---

[12] Section 406(a)(1)(C) prohibits the direct or indirect furnishing of services between a plan and a "party in interest," which ERISA defines as, among other things, a person providing services to a plan. 29 U.S.C. §§ 1106(a)(1)(C), 1002(14).  Such services transactions are not prohibited if the provider receives "no more than reasonable compensation."  29 U.S.C. § 1108(b)(2).

that Section 406(a) was meant to prevent." *Danza*, 533 F. App'x at 126 (dismissing § 406(a) claim against provider).

### 2.      Plaintiffs Are Not Entitled to the Relief They Seek.

Count IV fails for the independent reason that the relief that Plaintiffs seek is not available to them.  Plaintiffs seek only "damages" in Count IV, Compl. ¶ 86, but the statutory provision that they invoke—ERISA § 409, 29 U.S.C. § 1109—authorizes damages claims only against fiduciaries. *See Reich v. Rowe*, 20 F.3d 25, 28 (1st Cir. 1994) ("ERISA does not permit a civil suit for money damages against nonfiduciaries").  Because Count IV is asserted against Fidelity solely in its capacity as a non-fiduciary party in interest, Plaintiffs fail to state a viable claim for relief.

For these reasons, Count IV fails as a matter of law and should be dismissed.

### CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirely, with prejudice.

Dated:  July 22, 2016

Respectfully Submitted,

/s/ James R. Carroll
James R. Carroll (BBO #554426)
Michael S. Hines (BBO #653943)
SKADDEN, ARPS, SLATE
MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
michael.hines@skadden.com

/s/ Alison V. Douglass
Alison V. Douglass (BBO #646861)
Jaime A. Santos (BBO #689946)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
adouglass@goodwinprocter.com
jsantos@goodwinprocter.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Alison V. Douglass, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 22, 2016.

/s/ Alison V. Douglass