UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHERINE FLEMING, EDWARD R. HADUCK, and VICTORIA WENDEL, <br><br> Plaintiffs, <br><br> v. <br><br> FIDELITY MANAGEMENT TRUST COMPANY and FIDELITY INVESTMENTS INSTITUTIONAL OPERATIONS COMPANY, INC., <br><br> Defendants. | Civil Action No. 16-cv-10918-ADB |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiffs in this putative class action allege various violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq. [ECF No. 1] (hereinafter "Compl."). They claim that Defendants have breached their fiduciary duties under ERISA and engaged in transactions that ERISA prohibits. Compl. ¶¶ 67–86. Pending before the Court are three motions, all opposed: (1) Defendants' motion to dismiss for lack of subject matter jurisdiction [ECF No. 36]; (2) Defendants' motion to dismiss for failure to state a claim [ECF No. 23]; and (3) Plaintiffs' motion to strike an exhibit and related factual assertions [ECF No. 29]. For the reasons that follow, Defendants' motion to dismiss for lack of subject matter jurisdiction is DENIED, Defendants' motion to dismiss for failure to state a claim is ALLOWED, and Plaintiffs' motion to strike is DENIED AS MOOT.

## I. BACKGROUND

The following allegations are drawn from Plaintiffs' Complaint, with additional details reserved for later discussion. Plaintiffs Katherine Fleming, Edward Haduck, and Victoria Wendel are individual participants within the meaning of ERISA, 29 U.S.C. § 1002(7), in the Delta Family-Care Savings Plan ("Plan"). Compl. ¶¶ 1, 21–24. The Plan qualifies under ERISA as both an employee pension benefit plan, 29 U.S.C. § 1002(2)(A), and an individual account plan, 29 U.S.C. § 1002(34). Id. ¶ 25. Many of the employee accounts in question are 401(k) accounts, which permit individuals to contribute a portion of their salary and wages on a pre-tax basis in order to save for retirement. Id. ¶ 4.

Defendants Fidelity Management Trust Company ("FMTC") and Fidelity Investments Institutional Operations Company, Inc. ("FIIOC") were hired to provide certain services to the Plan. Id. ¶¶ 26–27. As trustee of the Plan, FMTC holds the Plan's investment assets and executes investment transactions as instructed by the Plan and individual Plan participants. Id. ¶ 27. FIIOC, a wholly owned subsidiary of FMTC, provides trust services, record-keeping, and information management services to the Plan. Id. ¶ 26.

The assets of the Plan are held in and invested through a Master Trust. Id. ¶ 50. The trust is controlled in all material respects by a Master Trust Agreement (along with related supplements and amendments) involving the Plan sponsor (Delta Air Lines, Inc.), the named fiduciary (the Delta Air Lines, Inc., Benefit Funds Investment Committee), the Plan administrator (the Administrative Committee of Delta Air Lines, Inc.), and the trustee (FMTC). [ECF No. 25 at Ex. A].

The Complaint alleges wrongdoing in two particular aspects of the Plan, although the Plan sponsor, named fiduciary, and administrator are not parties to the case. First, it challenges

the relationship between Defendants and a third party, Financial Engines Advisors, LLC ("FE"). Compl. ¶¶ 6–7. FE provides investment advice services to individual Plan participants. Id. ¶ 6. It charges a fee for these services that varies based on the value of a participant's individual account. Id. Second, the Complaint attacks the portal through which individual Plan participants are permitted to invest their savings on a self-directed basis. Id. ¶ 8. Branded as "BrokerageLink," this portal allows individuals to purchase an array of securities, including, most importantly here, a selection of mutual funds (both Fidelity and non-Fidelity funds) that are not included among the Plan's designated investment alternatives. Id. ¶¶ 9–10.

### A. FE Allegations

The gravamen of Plaintiff's allegations regarding FE is that Defendants and FE have agreed to an improper "pay to play" arrangement. Id. ¶ 7. Basically, Plaintiffs allege that FE, in exchange for being included as the Plan's investment advisor, agreed to pay Defendants a significant percentage of the fees that FE collects from individual Plan investors. Id. This fee-sharing arrangement, according to Plaintiffs, is unrelated to any substantial services performed by Defendants and artificially inflates the cost of investment advice for Plan participants, which violates the fiduciary responsibility and prohibited transaction provisions of ERISA, 29 U.S.C. §§ 1104, 1106. Id. Plaintiffs allege that, to effect this arrangement, Defendants "hired FE and controlled the negotiation of the terms and conditions under which FE would provide its services to Plaintiffs [and other] Plan participants," including the fee-sharing arrangement, and the fact that Defendants receive at least half of FE's Plan-related fees under the fee-sharing arrangement shows that Defendants' fee is "plainly unreasonable in relation to the service being provided." Id. ¶¶ 33, 38, 47.

### B. BrokerageLink Allegations

Plaintiffs acknowledge that individual Plan participants who use BrokerageLink exercise at least some discretionary control when it comes to their investment choices, including which mutual funds to purchase. Id. ¶ 10. They take issue, however, with the specific classes of mutual fund shares that are available for purchase through BrokerageLink. Id. ¶¶ 11–17.

Typically, a mutual fund that offers different share classes will offer both "retail" shares, which have higher expenses for the investor, and "institutional" shares, which generally have lower expenses. Id. ¶¶ 11–13. The Complaint alleges that when individual Plan participants use BrokerageLink to invest in mutual funds with different share classes, Defendants "do[ ] not always acquire the class of shares with the lowest expense ratio." Id. ¶ 16. Instead, Defendants acquire shares with higher fees, which typically include revenue-sharing payments made to parties who distribute the shares or provide other services. Id. ¶ 12–13, 16. Defendants, in turn, get a cut of these higher fees in the form of revenue-sharing payments. Id. ¶ 17.

Plaintiffs also allege that, in 2013, Defendants suddenly stopped reporting a list of funds from which they received revenue-sharing payments, disclosing only that they received an unspecified amount of indirect compensation from BrokerageLink. Id. ¶ 53. Plaintiffs allege "[t]here is no discernible purpose or justification" for this change other than "a deliberate attempt to conceal the amount of [Defendants'] compensation." Id. According to the Complaint, the purchase of higher-cost shares violates Defendants' obligations under ERISA to select share classes solely in the best interests of the Plan and its participants, and to refrain from using Plan assets for their own interests. Id. ¶ 17.

## II. PROCEDURAL HISTORY

Plaintiffs filed their Complaint on May 20, 2016. Compl. at 24. On July 22, 2016, Defendants filed a motion under Fed. R. Civ. P. 12(b)(6) seeking dismissal of the Complaint for

4

failure to state a claim upon which relief can be granted. [ECF No. 23]. Accompanying the motion was a declaration by Defendants' counsel, along with three exhibits, two of which were filed under seal. [ECF No. 25]. Plaintiffs opposed this motion on September 12, 2016, and filed a motion to strike one of the exhibits attached to the declaration, and related factual assertions contained in the memorandum in support of the motion. [ECF Nos. 28, 29]. Defendants opposed the motion to strike on October 17, 2016. [ECF No. 35]. Shortly thereafter, on November 3, 2016, Defendants filed a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). [ECF No. 36]. Plaintiffs responded to this motion on December 12, 2016 [ECF No. 42], and Defendants filed a reply on January 12, 2017 [ECF No. 45].

## III. DISCUSSION

"When a court is confronted with motions to dismiss under both Rules 12(b)(1) and 12(b)(6), it ordinarily ought to decide the former before broaching the latter." Deniz v. Municipality of Guaynabo, 285 F.3d 142, 149 (1st Cir. 2002). The Court follows that approach here, addressing first Defendants' motion to dismiss under Rule 12(b)(1), and then Defendants' motion to dismiss under Rule 12(b)(6) along with Plaintiffs' motion to strike.

### A. Subject Matter Jurisdiction

Defendants argue that the Court does not have subject matter jurisdiction over Plaintiffs' BrokerageLink claims because Plaintiff Fleming, the only named plaintiff to allege injury from using that service, lacks Article III standing. [ECF No. 37 at 10–11; Compl. ¶ 22–24]. Plaintiffs respond that Fleming has standing because she was "forced to pay unnecessary and excessive fees" by using the BrokerageLink platform. [ECF No. 42 at 2].

Standing doctrine recognizes this Court's limited power to hear "Cases" and "Controversies" under Article III of the U.S. Constitution. Hochendoner v. Genzyme Corp., 823

5

F.3d 724, 731 (1st Cir. 2016) (quoting U.S. Const. art. III, § 2, cl. 1). "The heartland of constitutional standing is composed of the familiar amalgam of injury in fact, causation, and redressability." Id. (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). When evaluating subject matter jurisdiction at the pleading stage, the Court must "accept the factual averments of the complaint as true, and construe those facts in the light most congenial to [Plaintiffs'] cause." Royal v. Leading Edge Prods., Inc., 833 F.2d 1, 1 (1st Cir. 1987). "Dismissal can be justified only if it clearly appears that no colorable hook exists upon which subject matter jurisdiction can be hung." Id.

Defendants' motion is premised on the fact that Plaintiffs' BrokerageLink theory appears to have evolved over the course of the litigation. The Complaint asserts a general allegation that Defendants, through BrokerageLink, "select[ed] share classes that charged higher fees . . . for the purpose of receiving significant amounts of revenue sharing payments." Compl. ¶¶ 77–78. In responding to Defendants' Rule 12(b)(6) motion to dismiss, Plaintiffs later tried to clarify the allegations in the Complaint, saying, "Plaintiffs claim quite simply that, once a participant selected a mutual fund to purchase, Fidelity had a choice of share classes to acquire. It did not disclose that choice to participants and it consistently and affirmatively *chose to acquire* a share class that resulted in greater compensation to Fidelity at the expense of the participants." [ECF No. 28 at 19] (emphasis added).

Seizing on this more specific allegation, Defendants then moved to dismiss for lack of subject matter jurisdiction, and included a declaration by an employee experienced in BrokerageLink's online platform in support. [ECF Nos. 36, 37 at 13]. The declaration avers that any investor who uses this platform to purchase mutual fund shares must enter or select a specific ticker symbol, which identifies both the mutual fund and the share class to be purchased.

[ECF No. 38 at 2–3]. Thus, by entering a particular ticker symbol, Fleming herself selected both the mutual fund and the share class for her investments. Id. According to Defendants, this means that Fleming suffered no injury in fact caused by the conduct alleged in the Complaint, and that the Court therefore lacks subject matter jurisdiction over Plaintiffs' BrokerageLink claims. [ECF No. 37 at 13].

In response, Plaintiffs dispute the facts asserted in the declaration and argue that Defendants' reliance on it demonstrates that their jurisdictional challenge is factual, rather than facial, in nature. [ECF No. 42 at 4–5]. See Torres-Negron v. J & N Records, LLC, 504 F.3d 151, 162–63 (1st Cir. 2007) (discussing different standards for factual versus facial jurisdictional challenges). Plaintiffs acknowledge that investors like Fleming do indeed "choose" the share class, even if only in a "purely mechanical sense," [ECF No. 42 at 6], but argue that Defendants remain liable under ERISA because BrokerageLink does not always offer investors "a meaningful choice of share class, such that the investor is free to choose the lowest cost share class for which that investor may be qualified." [ECF No. 42 at 3–4, 6].

Defendants do not assert that Fleming lacks standing to assert this more recent iteration of the BrokerageLink theory, which claims, in effect, that Plaintiffs did not have the option of choosing the most cost-efficient share class. [ECF No. 45 at 5]. Moreover, this theory is consistent with the more general allegation contained in the Complaint, which the Court at this stage is bound to construe in the light most favorable to Plaintiffs. See Royal, 833 F.2d at 1. Thus, this is not a case in which "no colorable hook exists upon which subject matter jurisdiction can be hung." Id. Accordingly, Defendants' motion to dismiss for lack of subject matter jurisdiction [ECF No. 36] is DENIED.

B.   Failure to State a Claim

7

To survive a motion to dismiss under Rule 12(b)(6), a "complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face." In re Fid. ERISA Float Litig., 829 F.3d 55, 59 (1st Cir. 2016) (quoting Saldivar v. Racine, 818 F.3d 14, 18 (1st Cir. 2016)). The plausibility question triggers a two-step analysis. Id. First, the Court must "distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Id. Second, it "must determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable." Id.

### 1. Count III: Fiduciary Duty (BrokerageLink)[1]

Plaintiffs allege in Count III of the Complaint that Defendants "had the discretionary authority to select the share classes of mutual funds to purchase for Plaintiffs and the Plans through BrokerageLink" and breached their duties of loyalty under ERISA, 29 U.S.C. §§ 1106(b)(1), 1106(b)(3), by "selecting share classes that charged higher fees than share classes otherwise available for investment." Compl. ¶¶ 74–77. According to the Complaint, Defendants did this "for the purpose of receiving significant amounts of revenue sharing payments" from the higher-cost funds. Id. ¶ 78. The Complaint alleges that this conduct violated two provisions of ERISA, one of which prohibits a "fiduciary with respect to a plan" from "deal[ing] with the assets of the plan in his own interest or for his own account," 29 U.S.C. § 1106(b)(1), and the other of which prohibits a "fiduciary with respect to a plan" from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan," 29 U.S.C. § 1106(b)(3). Id. ¶¶ 74–77.

---

[1] The Court discusses the counts in the Complaint in the order most conducive to its analysis rather than in the order presented by Plaintiffs.

8

Again, Plaintiffs' theory has evolved somewhat over the course of the litigation, but their current theory of BrokerageLink liability seems to be that Defendants breached their fiduciary duty to the Plan by "selecting" only higher-cost share classes to be available through BrokerageLink, while leaving out lower-cost share classes, and thereby maximizing their revenue-sharing payments at the expense of Plan participants. [See Compl. ¶¶ 77–78; ECF No. 28 at 16–17; ECF No. 42 at 6; ECF No. 43 at 2–4].

To establish liability under this theory, Plaintiffs must first demonstrate that Defendants qualify as "fiduciar[ies] with respect to a plan." 29 U.S.C. § 1106(b). See Pegram v. Herdrich, 530 U.S. 211, 226 (2000) ("In every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."); O'Toole v. Arlington Tr. Co., 681 F.2d 94, 97 n.1 (1st Cir. 1982) (indicating that fiduciary status is "predicate condition" for violation of § 1106(b)(1)).

Under ERISA, an entity is a fiduciary with respect to a plan only to the extent that it (1) exercises any discretionary authority or discretionary control respecting management of a plan or exercises any authority or control respecting management or disposition of its assets; (2) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so; or (3) has any discretionary authority or responsibility in the administration of such plan. 29 U.S.C. § 1002(21)(A). Emphasizing the statute's "to the extent that" language, the First Circuit has made clear that "fiduciary status is not an all or nothing proposition." Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 18 (1st Cir. 1998). Rather, "fiduciary liability arises in specific increments

9

correlated to the vesting or performance of particular fiduciary functions in service of the plan, not in broad, general terms." Id.

Thus, for Plaintiffs' BrokerageLink theory to go forward, they must first sufficiently allege that Defendants were exercising a fiduciary function with respect to the decision regarding which share classes would be available to Plan participants through BrokerageLink. They have failed to do so.

At this stage in the case, the Court is required to construe the facts alleged in the Complaint in the light most favorable to Plaintiffs and indulge all reasonable inferences in their favor. Yacubian v. United States, 750 F.3d 100, 107–08 (1st Cir. 2014). "However, '[i]t is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.'" Id. at 108 (quoting Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 229 n.1 (1st Cir. 2013)).

Here, the Court accepts as true Plaintiffs' assertion that Defendants were responsible for deciding which share classes of mutual funds would be made available through BrokerageLink. [ECF No. 28 at 16–17; ECF No. 42 at 6]. This, however, is a "product design" decision by Defendants that is wholly distinct from the decision to make BrokerageLink available to individual Plan participants. The Master Trust Agreement, which is incorporated by reference into the Complaint, demonstrates that this decision rested solely with Delta, either as the Plan sponsor or through its benefits committee. The agreement states that the Plan sponsor "shall determine the type of Plan investment options to be offered to Participants" and that Defendants "shall have no responsibility for the selection of investment options under the Trust."[2] [ECF No.

---

[2] On its face, this latter phrase could be interpreted as being in tension with the allegation, accepted as true at this stage of the case, that Defendants selected which share classes of mutual funds to make available through BrokerageLink. In context, however, it is clear to the Court that

10

25 at Ex. A, § 5(a)–(b)]. According to Schedule C of the Master Trust Agreement, the Delta committee, as Named Fiduciary, "direct[ed]" Defendants that individual accounts could be invested in a list of 28 funds or products, one of which was BrokerageLink. [ECF No. 25 at Ex. A, Schedule C].

Read together, this language makes plain that the Delta entities, not Defendants, retained control over whether BrokerageLink—and by extension the classes of mutual fund shares offered through it—was made available to Plan participants. There is no suggestion in the Complaint that Delta lacked the authority or ability to leave BrokerageLink off of Schedule C if it determined that the share classes offered through BrokerageLink were unsuitable for Plan participants. Accordingly, Defendants did not exercise the type of authority or control over the decision to include BrokerageLink in the Plan that would give rise to ERISA liability. See Columbia Air Servs., Inc. v. Fid. Mgmt. Tr. Co., No. 07-11344-GAO, 2008 WL 4457861, at *4 (D. Mass. Sept. 30, 2008) (rejecting ERISA complaint where it was "clear that the selection of the mutual funds was done by" plan sponsor rather than service provider). The Plan documents show that once Delta chose to include BrokerageLink on Schedule C, Defendants were bound to follow Plan participants' investment instructions and exercised no discretion or authority with respect to which securities participants elected to purchase. [See ECF No. 25 at Ex. A, § 5(c), (g)].

Plaintiffs' BrokerageLink theory closely resembles ERISA "product design" claims considered and rejected by at least two circuit courts. The Third Circuit Court of Appeals affirmed the dismissal of a complaint that alleged, in part, that John Hancock charged excessive fees to an ERISA plan by offering investment options that included fee-charging mutual fund

---

this language pertains to the inclusion of investment options on Schedule C, not to the initial selection of mutual fund share classes by Defendants in designing the BrokerageLink product.

11

share classes, when it could have negotiated for access to no-fee share classes. Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A), 768 F.3d 284, 292 (3d Cir. 2014). The claim failed because "a service provider owes no fiduciary duty to a plan with respect to the terms of its service agreement if the plan trustee exercised final authority in deciding whether to accept or reject those terms." Id. at 293. In other words, because "[n]othing prevented the trustees from rejecting John Hancock's product and selecting another service provider," John Hancock was not a fiduciary in selecting the funds offered through their investment product. Id. at 295.

Similarly, the Seventh Circuit Court of Appeals rejected an ERISA challenge to revenue-sharing agreements between a 401(k) plan's service provider and the mutual funds it offered to plan participants. Leimkuehler v. American United Life Ins. Co., 713 F.3d 905, 907–08 (7th Cir. 2013). The Seventh Circuit held that, "standing alone, the act of selecting both funds and their share classes for inclusion on a menu of investment options offered to 401(k) plan customers does not transform a provider of annuities into a functional fiduciary under [29 U.S.C. §] 1002(21)(A)(i)." Id. at 912. See also Hecker v. Deere & Co., 556 F.3d 575, 583 (7th Cir. 2009) ("[A] service provider does not act as a fiduciary with respect to the terms in the service agreement if it does not control the named fiduciary's negotiation and approval of those terms.").

Although it appears that the First Circuit Court of Appeals has not yet addressed this type of ERISA "product design" theory, Plaintiffs offer no compelling reason, and the Court sees none, to deviate from the reasoning of the Third and Seventh Circuits.

The Court also notes that the cases upon which Plaintiffs rely are distinguishable in important ways. Many involved defendants who possessed unilateral authority or control over which funds or investment options would be offered to plan participants. See Braden v. Wal-

12

Mart Stores, Inc., 588 F.3d 585, 589–90 (8th Cir. 2009); Charters v. John Hancock Life Ins. Co., 583 F. Supp. 2d. 189, 192, 199 (D. Mass. 2008); Haddock v. Nationwide Fin. Servs., Inc., 419 F. Supp. 2d 156, 161, 166 n.6 (D. Conn. 2006). That is not the case here, where the Master Trust Agreement indicates that Delta, and not any of the named Defendants, selected the roster of investment options available to Plan participants. [ECF No. 25 at Ex. A, § 5(a)–(b) and Schedule C]. In other cases cited by Plaintiffs, the defendants retained authority or control, beyond the reach of the plan sponsor, to set their own rates of compensation, which does not seem to be the case with respect to BrokerageLink. See Golden Star, Inc. v. Mass Mut. Life Ins. Co., 22 F. Supp. 3d 72, 75–76 (D. Mass. 2014); Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co., 931 F. Supp. 2d 296, 301–02 (D. Mass. 2013).

In sum, Plaintiffs have failed to plausibly allege that Defendants were exercising a fiduciary function under 29 U.S.C. § 1002(21)(A) when they decided which securities to make available through BrokerageLink because Delta retained ultimate authority to include or reject the BrokerageLink product from the list of investment options made available to Plan participants. Thus, Count III must be dismissed.

2. Count I: Fiduciary Duty (FE)

Count I of the Complaint, which relates to the investment advisor FE, runs into similar difficulties. This count claims that Defendants acted in a fiduciary capacity by "hiring FE and controlling the negotiation of the terms and conditions under which FE would provide its services to Plan participants" and by "selecting FE as an investment advice provider for Plan participants." Compl. ¶ 64. According to the Complaint, Defendants breached their duty of loyalty under ERISA by receiving revenue-sharing payments from FE at the expense of the Plan

13

and Plan participants, and by charging unreasonable and excessive fees for the services they provided to FE. Id. ¶ 65. The Complaint alleges that this conduct violates 29 U.S.C. §§ 1106(b)(1) and 1106(b)(3), the same two ERISA provisions discussed above. Id. ¶¶ 62–63.

This theory is premised on the notion that Defendants, rather than Delta, "hir[ed]" FE or "select[ed] FE as an investment advice provider for Plan participants," Compl. ¶ 64, but the Master Trust Agreement contradicts this premise. See Yacubian, 750 F.3d at 108 (describing "well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations"). The agreement states that the "Named Fiduciary" (here, the Delta Air Lines, Inc., Benefit Funds Investment Committee) "may also appoint an investment manager" and "has so appointed Financial Engines with respect to assets held in the individual Plan accounts of Participants enrolled in Professional Management." [ECF No. 25 at Ex. A, Amendment II, § 5]. It also states that the "Trustee" (here, FMTC) "shall have no responsibility" for the decision to offer such a service. Id., § 2.

This language is fatal to Plaintiffs' FE claim. No matter how generously one reads the allegations in the Complaint, the FE claim boils down to another version of the "product design" theory described above. See Santomenno, 768 F.3d at 292–93; Leimkuehler, 713 F.3d at 907–08, 912. The Court rejects this claim for the same basic reason: the Master Trust Agreement compels the conclusion that Delta, not Defendants, exercised final authority or control over the selection or hiring of FE. If Delta believed, as the Complaint alleges, that the fee-sharing arrangement between Defendants and FE "wrongfully inflate[d] the price of investment advice services,"

14

Compl. ¶ 7, Delta was free to decline to hire FE or to terminate its relationship with both Defendants and FE to avoid an unfavorable fee-sharing arrangement.[3]

Insofar as the Complaint challenges the amount of the fees that Defendants collect from FE, Courts have held that plan service providers (such as Defendants) are not acting in a fiduciary capacity when they negotiate with plan sponsors for their own compensation, so long as the final agreement with the plan does not give the service provider the ability to determine or control the actual amount of its compensation. See, e.g., F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1259 (2d Cir. 1987); Schulist v. Blue Cross of Iowa, 717 F.2d 1127, 1131–32 (7th Cir. 1983). The critical inquiry is who controls the "decision whether or not, and on what terms, to enter into an agreement" with a service provider. F.H. Krear & Co., 810 F.2d at 1259. Absent authority or control over that decision, a service provider "is not an ERISA fiduciary with respect to the terms of the agreement for his compensation." Id. Extending that logic to an agreement between Defendants and a third party, such as FE, it is difficult to see how a service provider could be an ERISA fiduciary when it negotiates a fixed rate of compensation from an entity other than the Plan, as Plaintiffs allege here. Importantly, the Complaint does not allege that, once FE was hired, Defendants retained any authority or control over the rate of

---

[3] This renders superfluous the parties' contentions regarding Defendants' own investment advice product and, consequently, renders moot Plaintiffs' motion to strike the exhibit establishing the existence of this product. The challenged exhibit is a Form ADV, filed with the Securities and Exchange Commission ("SEC"). [ECF No. 29 at 1; ECF No. 25 at Ex. C]. The Court believes this document would be judicially noticeable in any event. See, e.g., Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of facts on government website that were "not subject to reasonable dispute"); Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (proper for district court to take judicial notice of publicly available financial documents, including SEC filings); Citadel Equity Fund Ltd. v. Aquila, Inc., 168 F. App'x 474, 476 (2d Cir. 2006) (within court's discretion to take judicial notice of public SEC filing on motion to dismiss). The Court, however, does not rely on this document or the product that it discusses in resolving the Rule 12(b)(6) motion. Accordingly, Plaintiffs' motion to strike [ECF No. 29] is DENIED AS MOOT.

compensation it would receive from FE. See Danza v. Fid. Mgmt. Tr. Co., 533 F. App'x 120, 126 (3d Cir. 2013) ("What differentiates this case from cases in which we have held that [§ 1106(b)] applied is the fact that Fidelity, at the time it collected the fee, had no actual control or discretion over the transaction at issue—the price of the previously bargained-for fees."). Accordingly, Count I is dismissed.

### 3. Count IV: Prohibited Transaction Between Plan and Party in Interest

Count IV of the Complaint is based on a provision of ERISA that prohibits certain transactions involving non-fiduciaries:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest [or] transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1)(C)–(D). Generally, § 1106(a) is concerned about "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." Lockheed Corp. v. Spink, 517 U.S. 882, 893 (1996). In order to make out a claim under § 1106(a), "a plaintiff must show that a fiduciary caused the plan to engage in the allegedly unlawful transaction." Id. at 888–89.

Count IV alleges that Defendants are a "party in interest" within the meaning of ERISA, 29 U.S.C. 1002(14), by virtue of the trustee and other administrative services that they perform for the Plan. Compl. ¶ 83. The Complaint also directs the Court to Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 241 (2000), which held that even a non-fiduciary "party in interest" (such as Defendants here) sometimes may be held liable for a transaction barred by § 1106(a). The Complaint asserts that Defendants violate ERISA by receiving "excessive and unreasonable compensation" from (1) the fees they collect from the mutual funds

16

that Plan participants acquire through BrokerageLink and (2) the fees that FE shares with Defendants pursuant to their revenue-sharing agreement. Compl. ¶ 85.

Accepting as true the Complaint's allegation that the mutual funds and FE agreed to share parts of their fees with Defendants, Compl. ¶¶ 6–7, 12, 17, the claim nonetheless fails because none of these fees come from a transaction properly subject to § 1106(a)(1). Although the Complaint is correct that Defendants became parties in interest upon agreeing to provide administrative and trustee services, Compl. ¶ 83, the conduct complained of involves earlier transactions between Defendants *and mutual funds*, or Defendants *and FE*, in which Delta, as the only relevant Plan fiduciary, had no part. Nowhere does the Complaint allege that the Plan or Delta in any way caused those agreements to come into existence or participated in negotiating them. See Lockheed, 517 U.S. at 889 n.3 ("[T]he only transactions rendered impermissible by § [1106(a)] are transactions caused by fiduciaries."); Danza, 533 F. App'x at 125 (3d Cir. 2013) (reasoning that because service provider was not providing services and was not a fiduciary at the time trust agreement was signed, transaction was not prohibited by § 1106 (a)). To the contrary, the Complaint and the incorporated Master Trust Agreement indicate that Defendants' fee-sharing agreements pre-dated their involvement with the Plan.

Plaintiffs' prohibited transaction claim also fails because the Complaint does not plead knowledge of wrongdoing by a relevant fiduciary. See 29 U.S.C. § 1106(a)(1) (imposing liability only if fiduciary "knows or should know" that transaction is prohibited). Again, the only relevant Plan fiduciary here is Delta, but the Complaint makes no allegations, nor it is reasonably inferable from the facts alleged in the Complaint, that Delta knew or should have known that it was causing the Plan to engage in a transaction prohibited by § 1106(a). Instead, the Complaint alleges only that the Defendants knew their fee-sharing arrangement with FE was unlawful.

Compl. ¶ 70. As already discussed, Defendants were not exercising fiduciary responsibility when they entered into the fee-sharing agreements at issue in this case. See Patrico v. Voya Fin., Inc., No. 16 CIV. 7070 (LGS), 2017 WL 2684065, at *4 (S.D.N.Y. June 20, 2017) (rejecting prohibited transaction liability on similar grounds).

Finally, to the extent that Plaintiffs rely on 29 U.S.C. § 1106(a)(1)(D) [see ECF No. 28 at 23], their claim still fails. This provision bars a plan fiduciary from causing the plan to engage in a transaction involving the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D). Here, the fees that Defendants collect from the mutual funds or from FE are not "assets of the plan" within the meaning of ERISA.

The First Circuit has held that interest earned on the cash paid out by mutual funds is not an "asset of the plan" because "[t]he payout from the redemption does not go, and is not intended to go, to the plan itself." In re Fid. ERISA Float Litig., 829 F.3d at 60. Here, the fees at issue are destined for the mutual funds and FE, respectively, for the use and benefit of those entities. See Compl. ¶¶ 6–7, 12, 17. Because the fees that the mutual funds and FE collect from the Plan do not go to, and are not intended to go to, the Plan itself, they do not qualify as "assets of the plan," as required to make out a claim under 29 U.S.C. § 1106(a)(1)(D).

Even the authority cited in Plaintiffs' response supports this conclusion. The Department of Labor has advised that the "assets of a plan" are defined by "[a]pplying ordinary notions of property rights." DOL Advisory Op. 2013-03A (July 3, 2013). This typically "requires consideration of any contract or other legal instrument involving the plan, as well as the actions and representations of the parties involved." Id. Here, that principle requires consideration of the Master Trust Agreement, which incorporates by reference the pre-existing fee-sharing agreements between Defendants and the mutual funds, and Defendants and FE. Those

agreements, alongside the facts pleaded in the Complaint, support the view that the challenged fees are directed to the mutual funds and to FE rather than to the Plan. Accordingly, Count IV is dismissed.

### 4. Count II: Equitable Relief

Finally, Count II of the Complaint seeks equitable relief under 29 U.S.C. § 1132(a)(3). Compl. ¶ 69. This subsection permits a "participant, beneficiary, or fiduciary" to obtain an injunction or "other appropriate equitable relief" to redress an act or practice that violates ERISA. 29 U.S.C. § 1132(a)(3). The equitable relief permitted under ERISA does not authorize appropriate equitable relief "at large," but rather only such relief as will enforce the terms of a plan or ERISA itself. US Airways, Inc. v. McCutchen, 569 U.S. 88, 100 (2013).

Here, Plaintiffs' claim for equitable relief rises or falls with the viability of their claims alleging violations of §§ 1106(a) and 1106(b). The Complaint seeks to hold Defendants liable because they "knew or should have known" that their arrangement with FE violated §§ 1106(a) and 1106(b). Compl. ¶ 70. For the reasons already discussed, those underlying violations are dismissed. Therefore, Plaintiffs' claim for equitable relief also fails.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss under Rule 12(b)(1) [ECF No. 36] is DENIED. Defendants' motion to dismiss under Rule 12(b)(6) [ECF No. 23] is ALLOWED. Plaintiffs' motion to strike [ECF No. 29] is DENIED AS MOOT.

SO ORDERED.

Dated: September 22, 2017 /s/ Allison D. Burroughs  
ALLISON D. BURROUGHS  
U.S. DISTRICT JUDGE